## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                         :

**RYAN M. SMITH, ATLAS CAPITAL**    :        **Civil Action No:**
**MANAGEMENT, L.P., ATLAS**        :        **1:13-cv-12121-PBS**
**CAPITAL, L.P., ATLAS ADVANTAGE** :
**MASTER FUND, L.P., individually and** :
**on behalf of all others similarly**     :        **FIRST AMENDED CLASS**
**situated,**                      :        **ACTION COMPLAINT**
                          :        **FOR VIOLATIONS OF THE**
          **Plaintiffs,**      :        **FEDERAL SECURITIES LAWS**
                          :
                          :        <u>**Jury Trial Demanded**</u>
**v.**                         :
                          :
**THE FIRST MARBLEHEAD CORP.,**   :
**DANIEL MEYERS,**               :
**KENNETH KLIPPER,**           :
                          :
          **Defendants.**     :
_____

Plaintiff Ryan M. Smith and Lead Plaintiffs Atlas Capital Management, L.P., Atlas Capital, L.P. and Atlas Advantage Master Fund, L.P. (collectively "Plaintiffs") allege the following, individually and on behalf of all others similarly situated, based upon personal knowledge as to Plaintiffs' own acts and based on information and belief as to other acts. Plaintiffs' information and belief is based upon the  investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including, (i) review and analysis of public filings made by The First Marblehead Corporation ("FMD" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases, analyst reports, public statements, news articles, and other publications disseminated by, or concerning, FMD and the other defendants named herein; and (iii) review and analysis of the Company's conference calls, corporate website, and related statements and materials.  Many additional facts

supporting the allegations herein are known only to Defendants and/or are within their exclusive custody or control.   Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## I.     NATURE OF THE ACTION

1.      This is a federal class action against FMD and certain of its officers and directors for violations of the federal securities laws.   Plaintiffs bring this action on behalf of investors who purchased or otherwise acquired FMD securities between April 6, 2009 and August 15, 2013, inclusive (the "Class Period"), and were damaged thereby, and seek to pursue remedies under Sections 10 and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a),  and Rule 10b-5 17 C.F.R. § 240.10b-5 promulgated thereunder.

2.      FMD is incorporated in Delaware and has its principal place of business in Massachusetts.   The Company currently describes itself as a leading provider of outsourcing services for private, non-governmental education lending and as a provider of "customized private student loan solutions." The Company works with large and small banks and credit unions to design, underwrite, originate and manage their student loan programs.   It offers a platform for lenders to evaluate borrower risk and optimize repayment strategies. It also works with academic institutions concerning their student loan programs.   As shown below, however, prior to 2008, FMD followed a different business plan and was mainly engaged in the lucrative loan securitization business, the market for which declined in 2008 given macro-economic conditions.

3.      During the Class Period, FMD and the other Defendants fraudulently misrepresented the true state of the Company's financial condition by structuring corporate deals designed to make the Company appear more profitable and in a better financial condition than it

truly was.  Defendants then disseminated to investors key financial information about the Company's corporate dealings and about the Company's tax liabilities that deceptively described the purpose, effect and expected tax treatment of the key corporate transactions that were designed to prop up FMD's failing business.

4.      Specifically, Defendants repeatedly claimed that the Company's 2009 alleged "sale" of a trust certificate (the "Trust Certificate"), which represented an ownership interest in a statutory trust of pooled loans, valued at hundreds of millions of dollars, created substantial tax benefits for the Company.  Contrary to various Generally Accepted Accounting Principles ("GAAP") described below, Defendants contended that the transaction (the "Trust Certificate Transaction") represented a "sale" of the Trust Certificate. However, in connection with the alleged sale, FMD entered into a side Asset Services Agreement, pursuant to which FMD provided various consulting and advisory services on the subject loans to the purported purchaser for significant fees. Thus, the Company structured the Trust Certificate Transaction so that the Company actually retained control over the Trust Certificate after the purported sale closed, which would cause the Trust Certificate Transaction not to qualify as a sale under accounting and tax rules.  Defendants knew or recklessly disregarded these facts.

5.      FMD thus improperly recorded a significant loss in its financial statements relating to the Trust Certificate Transaction.  This loss contributed to the Company's net loss for fiscal year 2009, and caused the Company to record an income tax receivable for federal income taxes paid on taxable income in prior fiscal years.  In fiscal 2010, the Company received a total of $189.3 million in federal and state income tax refunds.  The Company received an additional federal income tax refund of $45.1 million in the following year (in October 2010) related to the operating losses it claimed in fiscal 2010.

6.      In April 2010, however, the IRS commenced an audit of the Company's tax returns for fiscal years 2007 through 2009, including a review of the tax treatment of the Trust Certificate Transaction.   Defendants, through statements in its SEC filings and other public disclosures, led investors to believe that this was a routine audit based on the size of the refunds received and not, as was in fact the case, an investigation of the Company's improper accounting for the Trust Certificate Transaction, which they knew violated GAAP.   This transaction had been designed to dupe investors and artificially prop up the Company during lean financial times.

7.      It was not until more than three years later, on August 15, 2013, that the Company disclosed that the IRS had been asserting that the Trust Certificate Transaction should not have been recognized as a sale for federal income tax purposes because the Company had retained the Trust Certificate's economic benefits and burdens through various side agreements that permitted the Company to retain certain repurchase and data rights.   The Company further disclosed at that time that the IRS asserted that the transaction should have been characterized as a financing instead of a sale and that the purported sale of the Trust Certificate and the concurrent execution of an Asset Services Agreement converted taxable income to the owner from an accrual basis to a cash basis.

8.      The Company further disclosed for the first time in August 2013 that the IRS was seeking to disallow the loss that generated the tax refunds the Company had previously received, and further to require the Company to include as taxable income the income derived from the Trust Certificate from the purported March 2009 "sale" date through June 30, 2011.   Most shockingly, the Company disclosed for the first time on August 15, 2013, three years after the IRS audit commenced, that FMD could be required to pay to the IRS $300 million plus interest,

which was continuing to accrue, an amount far in excess of the cash and short-term investments of the Company.

9. The Company later disclosed that the IRS had issued two Notices of Proposed Adjustments ("NOPAs") to it on September 10, 2013 that sought $300 million from FMD. The Company also disclosed that, despite the large amount of the potential penalty, which far exceeds the Company's cash and short-term investments, the Company did not record, in its accrual-based financial statements, a loss contingency related to the IRS audit.

10. Thus, during the entirety of the proposed Class Period, the Company failed to inform its investors that the 2009 "sale" of the Trust Certificate was a sham transaction designed to generate undeserved income tax benefits for the Company and that its position concerning the tax implications of the purported sale of the Trust Certificate was extremely tenuous. Moreover, the Company failed to disclose that the relevant tax guidance did not allow for the refunds and loss accruals claimed by the Company and did not comport with relevant legal requirements and that the Company lacked the liquidity to absorb its expected tax liabilities.

11. When the Company finally disclosed its tax liability of $300 million plus interest, and the facts that FMD's tax liability far exceeded its cash on hand and that the Company had not reserved any funds for this liability, the share price of the Company's stock lost more than a third of its value in a single day – declining from its close of $1.57 on August 15, 2013 to a close the following day of $1.00 (35% decline) on unusually high volume (758,600 shares traded). And the share price has continued to decline, reaching as low as $0.67 on September 23, 2013. The Company was required to complete a 1-for-10 reverse stock split in order to prevent the Company, which continues to lose millions of dollars each quarter, from being de-listed from the New York Stock Exchange ("NYSE").

12.     As a result of the Defendants' false and/or misleading statements, FMD shares traded at inflated prices during the Class Period.  Upon disclosure of the size and scope of the Company's expected tax liability and Defendants' improper accounting, FMD shares suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and other Class Members.

## II.     JURISDICTION AND VENUE

13.     The claims asserted in this Amended Complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a),  and Rule 10b-5 17 C.F.R. § 240.10b-5 promulgated thereunder

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.  15 U.S.C. § 78aa.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).  Many of the acts described in this Amended Complaint, including the preparation and dissemination of materially false and misleading in furtherance of the alleged fraud or the effects of the fraud have occurred substantially in this judicial district.  In addition, FMD maintains its principal executive office in Boston, Massachusetts.

16.     In connection with the acts, transactions, and conduct alleged in this Amended Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    THE PARTIES

17.    Plaintiff Ryan M. Smith, as set forth in the certification previously submitted to the Court [Dkt. No. 1], which is incorporated by reference herein, purchased FMD common stock during the Class Period and has been damaged by Defendants' conduct described in this Complaint.

18.    Plaintiffs Atlas Capital Management, L.P., Atlas Capital L.P., and Atlas Advantage Master Fund, L.P (collectively, "Atlas"), as set forth in the certification previously submitted to the Court [Dkt. No. 10], which is incorporated by reference herein, purchased FMD common stock during the Class Period and have been damaged by Defendants' conduct described in this Complaint.

19.    Defendant First Marblehead Corporation is a Delaware corporation with its principal place of business situated at 800 Boylston Street, 34th Floor, Boston, Massachusetts, 02199.  The Company's shares trade on the NYSE under the ticker symbol "FMD."

20.    Defendant Daniel Meyers ("Meyers") is the co-founder of the Company.  At all relevant times, he served as the Company's Chief Executive Officer ("CEO") and as a Director, positions he has held since September 2008.  He also served as Chairman of the Company's Board of Directors since May 2010.  From September 2008 to August 2013, he served as the Company's President.   As described below, Meyers signed the Company's relevant Forms 10-Q and 10-K filings and the certifications that accompanied those filings.

21.    Defendant Kenneth Klipper ("Klipper") was, at all relevant times, the Company's Chief Financial Officer and a Managing Director of the Company, positions he has held since September 2008.  He also served as the Company's Treasurer and Chief Accounting Officer from November 2006 to April 2011.   Mr. Klipper served as the Company's Senior Vice

President, Finance from March 2005 to September 2008. Mr. Klipper is a Certified Public Accountant. As described below, Klipper signed the relevant 10-Q and 10-K filings and the certifications that accompanied those filings.

22. Defendant Meyers and Klipper are together referred to as the "Officer and Director Defendants." During the Class Period, the Officer and Director Defendants, as senior executive officers of FMD, were privy to confidential information concerning the Company, its operations, financial conditions, and future business prospects. The Officer and Director Defendants also had access to material adverse, non-public information concerning the Company, as discussed throughout this Complaint. Because of their possession of such information, the Officer and Director Defendants knew or recklessly disregarded the adverse facts specified in this Complaint that had not been disclosed to, and were being concealed from, investors and the public.

23. The Officer and Director Defendants are liable as direct participants in the wrongs described in this Complaint. In addition, the Officer and Director Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act (15 U.S.C. § 78t) and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Officer and Director Defendants were able to, and did, directly control the conduct of FMD's business.

24. The Officer and Director Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the Company's SEC reports, press releases and presentations to securities analysts, portfolio managers and institutional investors, and through them, to the investing public. The Officer and Director

Defendants each received copies of the Company's reports and press releases prior to or shortly after their issuance.  The Officer and Director Defendants had the ability and opportunity to prevent the issuance of false and misleading reports.  Because of their positions and access to material, non-public information, the Officer and Director Defendants knew that the adverse facts described in this Complaint had not been disclosed to, and were being concealed from, investors and the public and that the positive representations which were being made were then materially false or misleading.  Accordingly, the Officer and Director Defendants are liable for false statements pleaded herein, as those statements were each "group-published" information, the result of their collection actions.

## IV.    SUBSTANTIVE ALLEGATIONS

### Background

25.    FMD was formed as a limited partnership in 1991 and was incorporated in Delaware in August 1994.  FMD went public in 2003, making an Initial Public Offering of $16 per share for 12,500,000 shares on January 1, 2003.

26.    Initially, the Company pursued a different business strategy than it follows today. In the first half of the 2000s, the Company was profitable, receiving the bulk of its revenues from structural advisory fees and residuals for its services in connection with securitizations of loans generated by the loan programs it facilitated.

27.    FMD incorporated an entity known as GATE Holdings, Inc. ("GATE Holdings") as a wholly-owned subsidiary of the Company in 1996.  GATE Holdings held the Company's title to residual interests in certain securities trusts (i.e., arrangements allowing for the participation in the receipt of cash flows emanating from pooled loans) through March 2009.  At that time, as described below, the Company converted GATE Holdings into a trust and then

transferred the Trust Certificate to VCG Owners Trust, a newly formed Delaware statutory trust. The transaction was structured to allow FMD to retain control over the trust and retain certain benefits and to reap undeserved tax benefits in the future.

28.     In its 2006 Annual Report, the Company adopted a minimum recognition threshold that one of its tax positions was required to meet before tax benefits would be recognized in the Company's financial statements.  After July 2007, under Financial Accounting Standards Board ("FASB") Interpretation No. 48 ("FIN 48")[1] and its own standards, the Company was allowed to recognize the tax benefit from an uncertain tax position only "if it [was] more likely than not that the tax position would be sustained upon examination by the taxing authorities, based on the technical merits of the tax position."

29.     The Company's Forms 10-Q and Forms 10-K filed with the SEC between November 9, 2007 and November 10, 2008 disclosed various IRS examinations of the Company's local, state and federal income tax returns for the years ending June 30, 2004 through 2008.  Also, during that time period, the Company began facing a multi-year review of certain tax matters by the Massachusetts Commissioner of Revenue and the Appellate Tax Board ("ATB") related to the tax treatment of the Company's former subsidiary GATE Holdings, the original holder of the Trust Certificate.

---

[1]   On September 2, 2009, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2009-06, *Implementation Guidance on Accounting for Uncertainty in Income Taxes and Disclosure Amendments for Nonpublic Entities*.  The ASU amended the *FASB Accounting Standards Codification TM* (ASC). The ASC is not the source of authoritative nongovernmental U.S. GAAP.  It was released on July 1, 2009 and went into effect for financial statements issued after September 15, 2009.  The ASC replaced the patchwork of FASB Statements of Financial Accounting Standards (FASs), Staff Positions (FSPs), Interpretations (FINs) and other guidance that previously defined GAAP.  *FIN 48,* which was superseded by the September 2009 FASB codification, had been developed to ensure more consistency in the accounting for benefits related to income tax positions.  Under the FASB codification, FIN 48 has been incorporated into ASC Topic 740, Income Taxes, as Subtopic 740.

**After the Company Suffered Financial Setbacks, Defendants Implemented A
Scheme to Reap Unjustified Tax Refunds And Inflate FMD's Share Price**

30.     Before 2009, the Company structured and facilitated the securitization of private education loans generated by its clients through a series of special purpose statutory trusts. Through the securitization process, the trusts obtained loans from the originating lenders or their assignees, which relinquished to the trusts their ownership interest in the loans.  The Company provided administrative and other services to the securitization trusts that they facilitated, providing asset servicing to the third-party owner of certain of those securitization trusts (the "NCSLT Trusts") and portfolio management services to a limited number of clients. The debt instruments issued by the trusts to finance the purchase of these private education loans were obligations of the trusts.  The Company was entitled to receive structural advisory fees from the trusts over time.

31.     The Company's securitization operations were hard hit by the financial downturn in the late 2000s.  Student loan asset-backed securitizations had historically been the Company's sole source of permanent financing.  However, the debt capital market deterioration that began during the second quarter of fiscal 2008, and the Company's inability to access the securitization market or interim financing facilities, materially adversely impacted the Company's business since 2008.  Additionally, as a result of the economic downturn, the Company's education loan portfolios and those held by the NCSLT Trusts experienced higher levels of default than had been expected.  The Company's lender clients previously had the opportunity to mitigate their credit risk through a loan repayment guaranty by The Education Resources Institute, Inc. ("TERI").  However, in April 2008, TERI filed a Chapter 11 petition under the Bankruptcy Code.

32.     Prior to fiscal year 2009, the Company did not charge separate fees for many of its services, but instead entered into agreements with clients giving the Company the exclusive right to securitize the education loans that they did not intend to hold. According to its recent Annual Reports, however, FMD has not completed a securitization transaction since 2008.

33.     Given the declines in capital markets that devastated FMD's lucrative securitization business, FMD overhauled its business model in fiscal 2009.  In the Form 10-Q that the Company filed with the SEC on February 9, 2009, for the period ending December 31, 2008, the Company indicated that it had developed "alternatives to the loan guaranty and loan origination services that TERI historically provided to the Company's clients."

34.     Recognizing the enormous adverse changes to their business landscape, Defendants put into place a scheme to generate substantial federal and state income tax windfalls that would make it appear as though FMD was a viable ongoing business.

35.     The Trust Certificate Transaction became effective on March 31, 2009.  In an April 6, 2009 press release, the Company indicated that it "sold" its ownership interest in NC Residuals Owners Trust, formerly known as GATE Holdings, the FMD subsidiary. NC Residuals Owners Trust was a statutory trust that owned certain certificates of beneficial ownership interests (also known as residuals) of the NCSLT Trusts.  The NCSLT Trusts held substantially all of the private education loans previously securitized by the Company and guaranteed by TERI.

36.     As a result of the Trust Certificate Transaction, the Company proclaimed to investors and the public that the "sale" of its ownership interest would, among other things, entitle FMD to a refund from the IRS for income taxes previously paid of $176.6 million and would further allow the Company to eliminate certain future tax liabilities. These alleged

enormous tax benefits had the intended effect of improperly shoring up the market for the Company's stock during lean financial times, making it appear as though it was a viable and going concern, when it was not, and allowing the Company to lure investors to purchase FMD stock at artificially inflated prices.

37.     In reality, as part of the Trust Certificate Transaction, FMD entered into a side agreement, the Asset Services Agreement, under which FMD allegedly provided various consulting and advisory services to the purchaser of the Trust Certificate, including certain analysis and valuation optimization services. As compensation, the Company was entitled to an asset servicing fee calculated as a percentage of the aggregate outstanding principal balance of loans outstanding in the trusts.

38.     The structure of the Trust Certificate Transaction permitted FMD to retain control over the terms of the potential resale of the Trust Certificate, the competitive use of its underlying assets, and its management.   The Company's continued control over the Trust Certificate is important in determining whether FMD should have continued to record it as an "asset" on the Company's financial statements after the purported sale.   According to *Concepts Statement No. 6, Elements of Financial Statements*, issued by FASB, an asset is defined by three essential characteristics, including that: (a) it embodies a probable future benefit that involves a capacity, singly or in combination of other assets, to contribute directly or indirectly to future net cash in-flows; (b) a particular entity can obtain the benefit and control others' access to it; and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred.

39.     The Company was further guaranteed future economic benefit in the form of an advisory fee pursuant to the Asset Services Agreement that any potential future purchaser would

have to pay to terminate.  Because the Company continued to retain certain benefits and control over the Trust Certificate, FMD should have recognized the Trust Certificate as an asset even after its purported sale.  In addition, pursuant to Section 61(a)(15) of the Internal Revenue Code, the Company should have continued to recognize the residuals from the Trust Certificate as part of its taxable income and, in a related manner, should not have recorded losses on its financial statements (and, eventually, in its income tax returns) relating to the purported sale of its interests in the Trust Certificate.

40.     On April 6, 2009, the Company filed a Form 8-K announcing FMD had entered into several agreements dated March 31, 2009.  Based on the way in which the Trust Certificate "sale" was accounted for by the Company, the transaction was designed to generate a cash refund of federal and state income taxes previously paid, which ended up being in the amount of $189.3 million.  The federal and state income taxes, however, were based on the Company's fraudulent description of the Trust Certificate Transaction.

41.     On September 29, 2010, in a Proxy Statement on Form 14A filed with the SEC, the Company disclosed that its Compensation Committee granted Defendant Meyer a "special bonus" of $2 million.  This bonus was granted, in part, because Meyers purportedly "significantly improv[ed] the viability of the Company, as demonstrated by an increase in the Company's cash, cash equivalents and short-term investments . . . the potential elimination of an estimated $430,000,000 in additional taxes over the remaining life of the NCSLT Trusts."  The Proxy Statement also revealed that the Compensation Committee granted Defendant Meyers 1.2 million fully vested stock units worth over $4.1 million.  Altogether, in connection with or coincident with the Trust Certificate Sale, Defendant Meyer received compensation in the amount of $16 million.

42.     Effective July 1, 2010, the Company adopted Accounting Standard Update ("ASU") 2009-16, *Transfers and Servicing (Topic 860)—Accounting for Transfers of Financial Assets,* and ASU 2009-17, *Consolidation (Topic 810)—Improvements to Financial Reporting by Enterprises Involved With Variable Interest Entities.* As a result, the Company consolidated 14 securitization trusts that were previously accounted for off-balance sheet. Although the Company claimed that it did not own any of the residual interests in the 11 NCSLT Trusts, under ASU 2009-17, the Company was required to consolidate the NCSLT Trusts because it received structural advisory fee receivables from the NCSLT Trusts and it provided services to the NCSLT Trusts related to default prevention and collection management.

43.     On May 10, 2011, the Company issued a press release announcing that, after consultation with KPMG, LLP, the Company's external auditors, the Company would restate the unaudited financial statements contained in FMD's Quarterly Report on Form 10-Q for the fiscal quarters ended September 30, 2010 and December 31, 2010. KPMG reported to the Company's Board of Directors and Audit Committee that the Company's designation of the NCSLT Trusts as non-controlling interests on the Company's balance sheet was not in accordance with GAAP. Accordingly, the Company would restate its statements of operation for the two quarters to eliminate the allocation of losses generated by the NCSLT Trusts to non-controlling interests. In the restated financials, the loss from the NCSLT Trusts was included in the Company's net loss, net loss per share and retained earnings.

**Defendants' Accounting Methods Violated Applicable Accounting Standards**

44.     ASC 740-10 (previously known as FASB Interpretation No. 48 or "FIN 48") establishes the requirements that companies with financial statements prepared in accordance with GAAP must follow when accounting for income taxes.

45.     The ASC requires that companies following GAAP apply a two-step process to determine the proper accounting for a tax position.  *See* ASC 740-10-55-3.  The first step is to determine whether a tax position has met the recognition threshold; the second is measuring the tax position that meets the threshold.  *Id.*  The recognition threshold is met when a company concludes that it is more likely than not that the taxpayer will sustain the benefit taken or expected to be taken in the tax return in a dispute with taxing authorities if the taxpayer takes the dispute to the court of last resort.

46.     ASC 740-10-25-5 specifically requires companies to determine whether their tax positions are likely to be upheld by regulatory bodies, most often the IRS.  In that context, the standard requires companies to consider whether a tax position is "more-likely-than-not" to withstand regulatory scrutiny when considering the tax treatment of particular transactions and circumstances.  Such recognition criteria apply to a tax position at the time it is recorded and is separate from the measurement of such tax position (discussed below). Under ASC 740-10-25-6, a company "shall initially recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination."  "The determination of whether or not a tax position has met the more-likely-than-not recognition threshold shall consider the facts, circumstances, and information available at the reporting date.  The level of evidence that is necessary and appropriate to support an entity's assessment of the technical merits of a tax position is a matter of judgment that depends on all available information."  *Id.*  In making the required assessment, "[i]t shall be presumed that the tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information."  ASC 740-10-15-7(a).

47.     The recognition and measurement requirements provide that the Company recognize "the largest amount of benefit that is greater than 50 percent likely of being realized upon settlement."  ASC 740-10-55-6.

48.     A company must "de-recognize" a previously recognized tax position in the first period in which it is no longer "more likely than not that the tax position would be sustained upon examination." ASC 740-10-40-2.  Moreover, "[i]f an entity that had previously considered a tax position effectively settled becomes aware that the taxing authority may examine or reexamine the tax position or intends to appeal or litigate any aspect of the tax position, the tax position is no longer considered effectively settled and the entity shall reevaluate the tax position." 740-10-40-3.

49.     The FASB's ASC codification with regard to the accounting for "Contingencies" also applies here.  The ASC glossary defines "contingency" as "an existing condition, situation or set of circumstances involving uncertainty as to possible gain or loss (loss contingency) to an extent that will ultimately be resolved when one or more future events occur or fail to occur."  The glossary defines a "loss contingency" as "an existing condition, situation or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

50.     The ASC requires disclosure of the contingency "if there is at least a reasonable possibility that a loss or an additional loss may have been incurred" and either "an accrual is not made for a loss contingency" or "exposure to loss exists in excess of the amount accrued."  ASC 450-20-50-3.  A disclosure pursuant to ASC 450-20-50-3 requires a disclosure of the "nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

51.     FASB has also issued guidance relating to the transfer of financial assets, including *Conditions for a Sale of Financial Assets.*  FASB 860-10-40-4 requires consideration of the transferor's continuing involvement in the transferred financial assets to determine whether a transaction can be considered a sale.  Additionally, that section requires consideration of all "arrangements or agreements made contemporaneously with, or in contemplation of, the transfer." 860-10-40-4(c).

52.     Under ASC 860-10-40-4A, "to be eligible for sale accounting, an entire financial asset cannot be divided into components before a transfer unless all of the components meet the definition of a participating interest."

53.     According to ASC 860-10-40-5, a financial transaction shall  be accounted for as a sale only if three conditions are met: (i) the transferred financial assets have been isolated from the transferor-put presumptively beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership; (ii) the transferee must have the right to pledge or exchange the asset in question; and (iii) the transferor must not maintain effective control over the transferred asset or beneficial interest.

54.     The term participating interest under ASC 860-10-40-6A requires that, after the transfer, "all cash flows received from the entire financial asset are divided proportionally among the participating interest holders . . .  in an amount equal to their share of ownership."

**Defendants Issued Materially False and
Misleading Statements During the Class Period**

55.     During the Class Period, Defendants repeatedly misrepresented the supposed benefits of the Trust Certificate Transaction while misrepresenting or failing to disclose the fact that the IRS was unlikely to allow the Company's claimed tax treatment for its alleged sale of the Trust Certificate; that the treatment exposed the Company to substantial tax penalties and other

18

liabilities that far exceeded its value and thus threatened the Company's viability; and that the

Company lacked adequate internal controls over financial reporting.

56.     On April 6, 2009, the Company described the Trust Certificate Transaction as

follows:

> The sale is expected to generate a cash refund for taxes previously paid, as the
> Company has been required to pay taxes on the expected residual cash flows from
> the NCSLT Trusts before it actually receives those cash flows.  Prior to this
> transaction, the Company has paid in excess of $195 million on taxable income
> associated with their interests in the NCSLT residuals over the past 7 years.  The
> Company estimates that it would be required to pay approximately $430 million
> in additional taxes over the remaining life of the residuals, with approximately
> $370 million to be paid prior to the residuals generating sufficient annual cash
> flows to offset the tax payments.  As a result of the transaction, the Company
> expects to eliminate any tax obligations from these residuals in their entirety.

> The refund is expected to be received by the Company in 2009 and 2010.

> The Company has also entered into an Asset Services Agreement with the
> purchaser of the Trust pursuant to which the Company has agreed to provide
> certain portfolio services for an annual fee based on the aggregate outstanding
> principal balance of the student loans owned by the NCSLT Trusts. The advisory
> fee will be earned but will not be paid until residual cash flows are distributed to
> the NCSLT Trusts.  If First Marblehead completes its obligations under the Asset
> Services Agreement as anticipated, the Company expects total revenues between
> the years 2009 and 2038 to be approximately $500 million, on an undiscounted,
> pre-tax basis, using current management assumptions regarding loan performance.

> First Marblehead continues to have rights to additional structural advisory fees
> from the NCLST Trusts and will continue to publish on its website its
> management assumptions as well as static pool data regarding performances of
> these trusts.  In addition, First Marblehead will continue to serve as administrator
> of the NCSLT Trusts.

57.     The press release describing the transaction quoted Defendant CEO Meyers as

follows:

> Management is pleased to have completed this transaction, which will
> significantly enhance our unrestricted cash.  With respect to the residual interests,
> the Company has paid income taxes on these residual interests without receiving
> any cash from these trusts.  By completing this transaction, we expect not only to
> stop the cash burn from these tax payments, but also to recapture a significant

portion of the taxes that the Company has paid to date on these residuals. In addition, we will assist the Purchaser with a host of portfolio management and data services thorough out the life of the NCSLT Trusts, for which we expect to receive contractual fees. This ensures that First Marblehead's interests continue to be aligned with those of the bondholders of these trusts.

58.     The press release announcing the transaction did not disclose that retention of the benefits made it highly unlikely that the IRS would agree with the Company's characterization of the Trust Certificate Transaction as a sale and, similarly, that the purported resulting tax benefits would pass IRS scrutiny.

59.     Market reaction to the announcement was quick, as FMD shares climbed 21% mid-day on April 6, 2009, closing at $2.12, a 44% increase over the previous close of $1.47 on April 3, 2009.

60.     On April 28, 2009, the Company issued a press release reporting results from the quarter ended March 31, 2009. Although the Company reported a net loss of $140.7 million, or $1.42 per share, and total losses of $130.6 million resulting from the sale of the Trust Certificate, the Company also reported $169.9 million in income taxes receivable, and no income taxes payable. The Company stated:

> The company ended the quarter with $184.8 million in cash, cash equivalents and investments. The sale of NC Residuals Owners Trust is expected to generate a cash refund for taxes previously paid, and the company recorded a net income tax receivable of approximately $170.0 million at March 31, 2009.

61.     On May 8, 2009, the Company filed its March 2009 Quarterly Report on Form 10-Q with the SEC. The Form 10-Q contained Sarbanes-Oxley-required certifications signed by Defendants Meyers and Klipper, as follows:

> 1. I have reviewed this report on Form 10-Q for the quarter ended March 30, 2012 for First Marblehead Corp;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation. of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a.  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

62.    In its May 2009 quarterly report, the Company asserted with respect to the tax implications of the Trust Certificate Transaction:

As a result of the sale of the Trust Certificate, the Company reversed $117,719[,000] of deferred tax assets recorded as of December 31, 2008 that pertain to temporary differences associated with its residual interests. The sale of the Trust Certificate is expected to change the Company's estimated taxable income for the year, to a taxable loss, which may allow the Company to carry back the net operating losses generated by the sale to previous years for Federal income tax purposes. Accordingly, the Company recorded a $177,366[,000] income tax receivable as of March 31, 2009.

During the second quarter of fiscal 2009, the deferred tax asset continued to grow due primarily to the taxable income generated by the Company's service receivables. The Company determined that a valuation allowance was necessary for certain deferred tax assets associated with its service receivables. As such, a valuation allowance totaling $6,433[,000] was recorded during the second quarter of fiscal 2009. The previously recorded valuation allowance was reversed during the third quarter of fiscal 2009 due to the sale of the Trust Certificate. The Company has determined that a valuation allowance is not necessary for the remaining deferred tax assets, as it is more likely than not that these assets will be realized through future reversals of existing temporary differences, and through future taxable income. The Company will continue to review the recognition of deferred tax assets on a regular basis.

Included in the income tax receivable balance at March 31, 2009, were $21,627[,000] of unrecognized tax benefits of which $14,058, if recognized, would favorably affect the effective income tax rate. The Company recognizes interest accrued related to unrecognized tax benefits in income tax expense. The Company recognizes penalties, if any, in income tax expense. During the first nine months of fiscal 2009, the Company accrued interest of approximately $341[,000] and had approximately $2,197[,000] accrued for interest and no amount accrued for the payment of penalties at March 31, 2009.

* * * * *

22

*Sale of the Trust Certificate.* On April 6, 2009, we announced the sale of the Trust Certificate, representing our ownership interest in NC Residuals Owners Trust, formerly known as GATE Holdings, Inc., to affiliates of Vanquish Capital Management LLC. We believe the sale of the Trust Certificate has significantly improved our near-term financial condition and liquidity. NC Residuals Owners Trust owned, directly and indirectly, certain certificates, which we refer to herein as the Trust Certificate, of beneficial ownership interests, which we refer to herein as Residuals, of the NCSLT Trusts. The sale is expected to generate a cash refund for taxes previously paid, as we have been required to pay taxes on the expected residual cash flows from the NCSLT Trusts before we actually receive those cash flows. Over the past seven years, we have paid more than $195 million on taxable income associated with the Residuals. In addition, we estimate that we would have been required to pay approximately $430 million in additional taxes over the remaining life of the Residuals, with approximately $370 million to be paid prior to the Residuals generating sufficient annual cash flows to offset the tax payments. As a result of the transaction, we expect to eliminate any tax obligations from the Residuals in their entirety. The refund is expected to be received during fiscal 2010.

63.     On August 17, 2009, the Company issued a press release reporting quarterly and annual results from the period ended June 30, 2009.  The Company reported a net loss of $36.1 million or $0.36 per share, on revenues of $11.6 million, for the quarter; and a net loss of $363 million or $3.66 per share for the year.   The Company also reported income tax receivables of $166.4 million, and no income taxes payable. The Company stated:

The company ended the quarter with $167.2 million in cash, cash equivalents and investments.  The sale of NC Residuals Owners Trust and the net operating losses are expected to generate a cash refund for taxes previously paid, and the company recorded an income tax receivable of approximately $166.4 million at June 30, 2009.

64.     On September 3, 2009, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2009.  The Company's Form 10-K was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-K included Sarbanes-Oxley required certifications signed by the Officer and Director Defendants similar in substance to the certifications described in paragraph 61 above.  The Company discussed its potential income tax liabilities as follows:

In addition, as of March 31, 2009, we sold the trust certificate, or Trust Certificate, of NC Residuals Owners Trust, which held our residual interests in The National Collegiate Student Loan Trusts, which we refer to in this annual report as the NCSLT Trusts. The NCSLT Trusts held substantially all of the TERI-guaranteed private education loans that we had previously securitized. The sale of the Trust Certificate is expected to generate a refund for income taxes previously paid and eliminate certain of our future tax liabilities, which would have had a material negative effect on our financial condition and liquidity. As a result of this sale, we are no longer entitled to receive residual cash flows from the NCSLT Trusts, and our financial results for fiscal 2009 included a write-down of our residuals receivables of $134.5 million as a result of the transaction. We continue to have rights to additional structural advisory fees and will earn asset servicing fees from the NCSLT Trusts, as well as additional structural advisory fees and residuals from certain trusts other than the NCSLT Trusts.

\* \* \* \* \*

Effective March 31, 2009, we completed the sale of the Trust Certificate, representing our ownership interest in NC Residuals Owners Trust, in a transaction intended to improve our financial condition and liquidity. The sale of the Trust Certificate is expected to generate a cash refund for income taxes previously paid, as we have been required to pay income taxes on the expected residual cash flows from the NCSLT Trusts in excess of what we have actually received. In addition, we estimate that we would have been required to pay approximately $430 million in additional taxes over the remaining life of these residuals, with approximately $370 million to be paid prior to the residuals generating sufficient annual cash flows to offset the tax payments. As a result of the transaction, we expect to eliminate any tax obligations from these residuals. The U.S. federal and state income tax consequences are complex and uncertain. The Internal Revenue Service or a state taxing authority could challenge our tax positions in connection with the transactions, even after we receive any tax refunds. If such a challenge were successful, in whole or in part, we may not receive or keep a refund for taxes previously paid, or we may not eliminate our tax obligations relating to the residuals. In either case, our near-term financial condition and liquidity would be materially adversely affected. In addition, any investigation, audit or suit relating to the sale, including any such proceeding brought by the Internal Revenue Service, could result in substantial costs.

\* \* \* \* \*

We remain focused on preserving capital and maximizing liquidity in these challenging market conditions. During fiscal 2009, we received $132.7 million in gross proceeds from an equity financing, and we greatly reduced our annual cash expenditure requirements through reductions in headcount, consolidation of office space and other cost saving initiatives that began in fiscal 2008. In addition, as of March 31, 2009, we sold the Trust Certificate, which represented our residual

interests in substantially all of the TERI-guaranteed private education loans that we had previously securitized. As a result of this transaction, we expect to generate a refund for income taxes previously paid and eliminate certain of our future tax liabilities, which would have had a material negative effect on our financial condition and liquidity. Also, we are no longer entitled to receive residual cash flows from the NCSLT Trusts, which represented substantially all of our residuals receivables; however, we continue to have rights to additional structural advisory fees and will earn asset servicing fees from the NCSLT Trusts, as well as additional structural advisory fees and residuals from certain trusts other than the NCSLT Trusts.

\* \* \* \* \*

We sold the Trust Certificate effective March 31, 2009. Under the terms of the sale, we are no longer entitled to receive any amounts related to the residual interests in these trusts. At the time of the sale, we reduced our residuals receivables by $134.5 million, in addition to net write-downs of $148.8 million recorded prior to the sale for changes in assumptions regarding discount rates, prepayment rates, net default rates and auction rate notes spread prior to the sale and fourth quarter adjustments to residuals of trusts not part of the sale. . . . . We continue to have the right to receive a portion of the residual interests, if any, generated by various securitization trusts other than the NCSLT Trusts. This right is junior in priority to the rights of the holders of the debt sold in the securitizations and additional structural advisory fees.

65.     On October 26, 2009, the Company issued a press release reporting results from the first quarter of fiscal 2010, which ended September 30, 2009.  The Company reported total revenues for the first quarter of fiscal 2010 of $13.5 million, as compared to a loss of $84.9 million for the same period last year.  The Company also reported a net loss of $94.1 million, or $0.95 per share.   The Company stated:

The company ended the quarter with $176.9 million in cash, cash equivalents and investments. On October 1, 2009, the company received $176.6 million from the Internal Revenue Service as a refund for federal taxes previously paid. On October 16, 2009 the company received proceeds of $121.5 million upon the sale of a portfolio of private student loans held by its bank subsidiary. Following receipt of the tax refund and portfolio sale proceeds, the company had approximately $475 million of cash, cash equivalents and investments on a consolidated basis.

66.     On November 6, 2009, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2009.  The Company's Form 10-Q was signed by the Officer and Director Defendants, and it reaffirmed the Company's financial results announced on October 26, 2009.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants substantially similar to the ones described above in paragraph 61 above.   The Company stated concerning its potential income tax liabilities:

> Prior to fiscal 2009, we structured and facilitated the securitizations of private education loans generated by our clients through a series of bankruptcy remote, special purpose statutory trusts. Through the securitization process, the trusts obtained loans from the originating lenders or their assignees, which relinquished to the trust their ownership interest in the loans. The debt instruments issued by the trusts to finance the purchase of these private education loans are obligations of the trusts, not obligations of us or the originating lenders or their assignees. For our past securitization services, we are entitled to receive additional structural advisory fees from the trusts over time. Effective March 31, 2009, we sold the trust certificate (Trust Certificate) of our subsidiary NC Residuals Owners Trust, formerly known as GATE Holdings, Inc., a statutory trust that owned certain certificates of beneficial ownership interests, also known as residuals, of the NCSLT Trusts. The NCSLT Trusts held substantially all of the private education loans previously securitized by us and guaranteed by The Education Resources Institute, Inc. (TERI), a not-for-profit organization. As a result of the sale, we are no longer entitled to receive residual cash flows from the NCSLT Trusts. However, we continue to be entitled to receive residual cash flows from other trusts, and we are entitled to receive asset servicing fees for our services that support the purchasers' ownership of the Trust Certificate. In addition, during fiscal 2009, we began to receive service fees for stand-alone services for loan origination and default prevention and collections services.
>
> * * * * *
>
> During fiscal 2009, we implemented a plan to adjust our business model and address some of the uncertainties facing us. We made major changes in senior management, significantly reduced our operating expenses and sold the Trust Certificate. The sale of the Trust Certificate, coupled with operating losses for fiscal 2009, generated a refund on October 1, 2009 from the Internal Revenue Service (IRS) for income taxes previously paid of $176,636 [million] and is expected to eliminate certain future tax liabilities, which would have had a material negative effect on our financial condition and liquidity.

* * * * *

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded an income tax receivable for federal income taxes paid on prior taxable income.  On October 1, 2009, we received $176,636 [million] from the IRS related to our income tax receivables.

67.     On January 29, 2010, the Company issued a press release reporting its financial results for its second quarter of fiscal 2010 and for the six-month period ended December 31, 2009.  The Company reported total revenues of $10.1 million and a net loss of $11.7 million or $0.12 per share.

68.     On February 9, 2010, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2009.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.  In its February 2010 10-Q, the Company stated:

During fiscal 2009, we implemented a plan to adjust our business model and address some of the uncertainties facing us.  We made major changes in senior management, significantly reduced our operating expenses and sold the Trust Certificate.  The sale of the Trust Certificate, coupled with operating losses for fiscal 2009, generated a refund in October 2009 from the Internal Revenue Service for income taxes previously paid of $176,636 [million] and is expected to eliminate certain future tax liabilities, which would have had a material negative effect on our financial condition and liquidity.

69.     The Company described the NCSLT Trust transactions as follows in the February 2010 10-Q:

NC Residuals Owners Trust, a statutory trust, directly or indirectly owned certain certificates of beneficial ownership interests of the NCSLT Trusts.  As a result of our sale of the Trust Certificate, we are no longer entitled to the residual cash flows of the NCSLT Trusts, although we continue to be entitled to receive

27

residuals from other trusts.  The purchasers of the Trust Certificate agree to bear all future federal and state tax liabilities associated with the NCSLT Trust residuals.

\* \* \* \* \*

We entered into the Asset Services Agreement in April 2009, pursuant to which we have agreed to provide certain services to the purchasers of the Trust Certificate to support their ownership of the NCSLT Trust residuals, including analysis and valuation optimization services and services relating to funding strategy.  As compensation for our services, we are entitled to an asset servicing fee, calculated as a percentage of the aggregate outstanding principal balance of loans outstanding in the NCSLT Trusts.  Although this fee is earned monthly, we will not receive any asset servicing fees until the purchasers have begun to receive residual cash flows.  We earned asset servicing fees of $2.0 million during the second quarter and $4.2 million for the first six months of fiscal 2010.

70.     Under a Section of the February 2010 10-Q entitled "Income Tax Benefit" the Company stated:

Income tax benefit for the second quarter of fiscal 2010 was $9.4 million, for a total benefit of $52.0 million for the first six months of fiscal 2010.  The income tax benefit for fiscal 2009 was $51.8 million for the second quarter and $104.8 million for the first six months.

\* \* \* \* \*

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded an income tax receivable for federal income taxes paid on prior taxable income. In the first six months of fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.

71.     In a section of the February 2010 10-Q entitled "Financial Condition, Liquidity and Capital Reserves," the Company stated:

We expect to fund our short-term liquidity requirements primarily through cash and cash equivalents and revenues from operations, and we expect to fund our long-term liquidity requirements through revenues from operations and issuances of common stock, promissory notes or other securities.  We expect to assess our financing alternatives periodically and access the capital markets opportunistically. If our existing resources are insufficient to satisfy our liquidity requirements, or if we were to enter into a strategic arrangement with another company, we may need to sell additional equity or debt securities.

In the above section, the Company did not note that its liquidity or capital funding requirements might depend on factors including the IRS's acceptance of the phony accounting for the "sale" of the Trust Certificate.   In the February 2010 10-Q, the Company indicated that it had combined cash, cash equivalents, federal funds sold, short-term investments and investments held for sale of $456 million and $181.5 million, at December 31, 2009 and June 30, 2009, respectively.

72.     On April 23, 2010, the Company issued a press release reporting results from the quarter ended March 31, 2010.  The Company reported a net loss of $29.4 million, or $0.30 per share, on revenues of $16.8 million and income tax receivable of $3.8 million.

73.     On May 10, 2010, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2010.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

74.     For the third quarter of fiscal 2010, the Company recorded a net loss of $29.4 million, or $0.30 per share, compared to a net loss of $140.7 million, or $1.42 per share for the same period in the prior fiscal year.  The net loss for the nine-month period was $135.2 million, or $.36 per share, an improvement over the net loss of $326.9 million, or $3.30 per share, for the same period in the prior fiscal year.

75.     In the "Income Taxes" section of the May 2010 10-Q, the Company stated that the Company's income tax benefit for the third quarter of fiscal 2010 was $15.4 million.   It further stated:

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded income tax receivables during fiscal 2009 for federal and state income taxes paid on prior taxable income.  In the first nine months of fiscal 2010, we received a total of $189,323 [thousand] in federal and state tax refunds related to our income tax receivables.

76.     The Company noted in the May 2010 10-Q that: "During April 2010, the IRS commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009.  We do not know what the outcome of the audit will be at this time.  As of the date of this quarterly report, no adjustments have been proposed."  The Company did not disclose that the scope of the audit included questions about the accounting for the Trust Certificate Transaction or the severity of the potential consequences and penalties that could arise from the audit if the IRS deemed the accounting for the Trust Certificate Transaction inappropriate.

77.     The May 2010 10-Q further stated that:

In the first nine months of fiscal 2010, we received $189.3 million in federal and state tax refunds on income taxes previously paid by us on prior taxable income. The refunds resulted from our losses from operations and the sale of the Trust Certificate. During the third quarter of fiscal 2010, the Internal Revenue Service, or IRS, began an audit of our federal tax returns for fiscal 2007, 2008 and 2009. The IRS or a state taxing authority could challenge our tax positions in connection with the transactions, notwithstanding our receipt of any tax refund.

78.     On August 16, 2010, the Company issued a press release reporting results from the quarter ended June 30, 2010.  The Company reported a net loss of $10.4 million, or $0.10 per share on income tax receivable of $17.5 million.  The press release failed to disclose that the IRS would likely require that a substantial portion of the income tax receivables the Company collected would need to be surrendered to the IRS.

79.     On September 2, 2010, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2010.  The Company's Form 10-K was signed by the

Officer and Director Defendants and reaffirmed the Company's previously announced financial

results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the

Officer and Director Defendants, substantially similar to the certifications described in paragraph

61 above.

80.     Among the alleged achievements noted in the Annual Report, the Company

stated:

> In October 2009, we received tax refunds of $176.6 million related to operating
> losses for fiscal 2009 and the sale of the Trust Certificate in fiscal 2009.  In
> addition to the tax refund generated, the sale of the Trust Certificate is expected to
> eliminate certain future tax liabilities, which would have a material negative effect
> on our financial condition and liquidity.  As a result of the sale, we are no longer
> entitled to receive residual cash flows from the NCSLT Trusts, although we
> continue to have rights to previously recorded additional structural advisory fees
> and ongoing asset servicing fees from the NCSLT Trusts, as well as previously
> recorded structural advisory fees and residuals from certain trusts other than the
> NCSLT Trusts.
>
> \* \* \* \* \* \*
>
> We have made substantial progress in improving our financial condition and
> liquidity since the beginning of fiscal 2009.  At June 30, 2008, we had $140.9
> million of cash, cash equivalents and investments.  Compensation and benefits
> expense during fiscal 2008 was $96.7 million, and our product offering was
> dependent on securitization markets that we could not access and a bankrupt
> third-party guarantor.  In addition, we were at the time confronting significant
> future tax liabilities on income from the NCSLT Trusts prior to our receipt of cash
> from these trusts. . . .  In contrast, we ended fiscal 2010 with $384.5 million of
> cash, cash equivalents and investments.  Compensation and benefits expense
> during fiscal 2010 was $43.1 million. . . . .We believe that we have eliminated our
> future tax liabilities relating to income from the NCSLT Trusts. . . .

81.     With regard to  income taxes, the fiscal 2010 10-K stated:

> Our income tax benefit decreased to $70.3 million in fiscal 2010 from $187.8
> million in fiscal 2009. . . . As a result of the sale of the Trust Certificate, effective
> March 31, 2009, as well as our operating losses for fiscal 2009, we recorded
> income tax receivables during fiscal 2009 for federal and state income taxes paid
> on prior taxable income.  During fiscal 2010, we received a total of $189.3
> million in federal and state income tax refunds related to our income tax
> receivables.  During April 2010, the IRS commenced an audit of our tax returns

for fiscal years 2007, 2008 and 2009.  We cannot predict the timing or outcome of the audit at this time.

82.     Note 19 to the fiscal 2010 10-K discussed income taxes as follows:

During April 2010, the Internal Revenue Service commenced an audit of our tax returns for fiscal years 2007, 2008, and 2009.  We cannot predict the timing or outcome of the audit at this time. . . .

Income tax benefit for fiscal 2010 was $70.3 million.  Income tax benefit for fiscal 2009 was $187.8 million. . . . .

* * * * *

As a result of the sale of the Trust Certificate, effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded income tax receivables during fiscal 2009 for federal and state income taxes paid on prior taxable income. During fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.

83.     On November 4, 2010, the Company issued a press release reporting results from the first quarter of fiscal 2010, which ended September 30, 2010.  The Company reported a net loss of $10.6 million or $0.11 per share.

84.     On November 9, 2010, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2010.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

85.     Regarding the IRS audit, the Company stated in the November 2010 10 Q:

During April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009. In connection with the October 1, 2010 tax refund, the IRS has expanded its audit to include fiscal year 2010. We cannot predict the timing or outcome of the audit at this time. As of the date of this quarterly report, no adjustments had been proposed by the IRS.

86.     On February 1, 2011, the Company issued a press release reporting results from the quarter ended December 31, 2010.  The Company reported a net loss of $1.5 million or $0.01 per share and income taxes payable of $25.8 million.

87.     On February 9, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2010.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

88.     The Company disclosed in its February 2011 10-Q that:

We are involved in several matters before the Massachusetts Appellate Tax Board (ATB) relating to the Massachusetts tax treatment of GATE Holdings, Inc. (GATE), a former subsidiary of FMD.  We have taken the position in such matters that GATE is properly taxed as a financial institution and is entitled to apportion its income under applicable provisions of Massachusetts tax law.  The Massachusetts Commissioner of Revenue (Commissioner) has taken the position, alternatively, that GATE is properly taxable as a business corporation or that GATE is taxable as a financial institution but it is not entitled to apportionment or is subject to 100% Massachusetts apportionment.  In September 2007, we filed a petition with the ATB seeking a refund of state tax for our tax year ended June 30, 2004, all of which tax had previously been paid as if GATE were a business corporation. In December 2009, the Commissioner made additional assessments of tax, along with accrued interest, of approximately $11.9 million for GATE's tax years ended June 30, 2004, 2005 and 2006 and approximately $8.1 million for our tax years ended June 30, 2005 and 2006. In March 2010, we filed petitions with the ATB contesting the additional assessments against GATE and us.  The assessments against GATE are in the alternative to the assessments against us, and if the assessments against GATE for the year ended June 30, 2004 are valid, then we would be entitled to a refund of approximately $1.1 million in tax for the same fiscal year.  An evidentiary hearing has been scheduled for these matters before the ATB in April 2011.  We cannot predict the timing or outcome of these matters at this time, and an adverse outcome may have a material impact on our state tax liability not only for the tax years at issue, but also for fiscal years 2007 through 2009.  We believe we have adequate reserves recorded for these matters in our balance sheet for all of the potentially affected tax years.

89.     Regarding the IRS audit, the Company stated in the February 2011 10-Q:

As a result of the sale of the Trust Certificate effective March 31, 2009, as well as our operating losses for fiscal 2009, we recorded an income tax receivable of federal income taxes paid on prior taxable income.  In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.   In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal years 2007, 2008 and 2009. **Such audits are consistent with the practices of the Joint Committee of Taxation based on the size of the tax refunds we received.** In connection with its audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the tax refund previously received by us.   The IRS has expanded its audit to include our fiscal year 2010 returns in light of the $45.1 million refund we received in October 2010. We cannot predict the timing or outcome of the audit at this time. No adjustments have been proposed by the IRS in connection with its audit.

(Emphasis added.)

90.     On May 16, 2011, the Company issued a press release reporting results from the quarter ended March 31, 2011.  For the third quarter of fiscal 2011, the Company recorded a net loss of $39.3 million, or $0.39 per share and income taxes payable of $40.3 million.   On the same date, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2011.   The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.   The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

91.     Regarding the IRS audit, the Company stated in its 10-Q:

As a result of the sale of the Trust Certificate, which was effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for taxable years 2007, 2008 and 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who claims and receives a tax refund of a specified magnitude. In connection with this

audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our fiscal 2010 tax return in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of March 31, 2011, the IRS has not proposed any adjustments in connection with its audit.

92.     On August 30, 2011, the Company issued a press release reporting results from the quarter and full year ended June 30, 2011.  The Company reported a quarter net loss of $83.8 million, or $0.83 per share, and an annual net loss of $221.6 million, or $2.20 per share, and income taxes payable of $39.9 million.

93.     On September 8, 2011, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2011.  The Company's Form 10-K was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-K included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

94.     In the fiscal 2011 10-K, the Company explained that as a result of its required July 1, 2010 consolidation of 14 securitization trusts that the Company had previously accounted for off-balance sheet, the Company recorded a "net increase in total assets and total liabilities of $7.90 billion and $8.78 billion, respectively, and a net decrease in total stockholders' equity of approximately $880.1 million."

95.     In addition, the Company stated in the 2011 10-K that:

beginning with the first quarter of fiscal 2011, our results of operations no longer reflect securitization-related trust updates or administrative fees received from the 14 consolidated securitization trusts.  Instead, we recognized interest income associated with securitized assets, including education loans, in the same line item as interest income from non-securitized assets, as well as a provision for loan losses, and we recognize interest expense associated with debt issued by the

35

securitization trusts to third-party investors on the same line item as other interest-bearing liabilities of FMD.

96.    The Company admitted in its 2011 10-K that, because its consolidated financial results include the NCSLT Trust that it claims it did not "own," it "may be difficult for investors to understand and analyze our financial results without evaluating the results of our Education Financing segment."  The Company noted that it was "required to consolidate the NCSLT Trusts as a result of our additional structural advisory fee receivables from the NCSLT Trusts and services provided to the NCSLT Trusts by our Education Financing segment related to default prevention and collections management."  The Company also recognized that because it facilitated and structured a number of different special purpose trusts that were used in securitizations to finance education loans their clients originated, the Company could be deemed responsible for losses to investors in those trusts.

97.    The Form 10-K further stated:

In determining a provision for income taxes, we base our estimated annual effective tax rate on expected annual income, statutory tax rates, our ability to utilize net operating loss carry forwards and tax planning opportunities available to us in the various jurisdictions in which we operate.  The estimated annual effective income tax rate also includes our best estimate of the ultimate outcome of income tax audits.

We use the asset and liability method of accounting for recognition of deferred income taxes.  Under the asset and liability method, we recognize deferred tax assets and liabilities in connection with the tax effects of temporary differences between our financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss carrybacks and carry forwards. We measure deferred tax assets and liabilities using enacted tax rates expected to be recovered or settled.  We recognize the effect of a change in tax rates on deferred tax assets and liabilities as tax expense (benefit) in the period that includes the enactment date.  We establish a deferred tax asset valuation allowance if we consider it more likely than not that all or a portion of the deferred tax assets will not be realized.

98.     On November 2, 2011, the Company received written notice from NYSE Regulation, Inc. ("NYSE Regulation") indicating that FMD was not in compliance with the NYSE's continued listing standards because the Company's average closing price was less than $1.00 per share over a consecutive 30 trading-day period.  The Company had 60 days to comply with the requisite average closing price or the NYSE would commence delisting procedures.

99.     On November 3, 2011, the Company issued a press release reporting results for the first quarter of fiscal 2012.  The Company reported net loss of $88 million or $0.87 per share for the first quarter of fiscal year 2012.   The press release also reported that as of September 30, 2011, the Company had $245.4 million in cash, cash equivalents and short term investments. The Company also announced that NYSE Regulation had issued a notice that the 30 day trading period average had fallen below the NYSE's continued listing standard of $1.00 per share.

100.    On November 8, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2011.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

101.    The November 2011 10-Q stated with regard to the IRS audit:

As a result of the sale of the Trust Certificate, effective March 31, 2009, as well as our operating losses in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years.  In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables.  In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for taxable years 2007, 2008 and 2009.  Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who receives a tax refund in excess of $2.0 million.  In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us.  The IRS

has also expanded its audit to include our fiscal 2010 tax return in light of the $45.1 million tax refund that we received in October 2010.  We cannot predict the timing or outcome of the IRS audit.  As of September 30, 2011, the IRS had not proposed any adjustments in connection with its audit.

102.    On November 12, 2011, the Company received notice that the Massachusetts ATB had issued an order concerning a former subsidiary of FMD for fiscal years 2004-2006.

103.    On November 14, 2011, the Company filed a press release announcing that it sold to VCG Special Opportunities Master Fund Limited its variable interests in the NCSLT Trust for $13 million in cash.  The press release reported that the variable interests in the NCSLT Trusts consisted of service fees to which the Company was entitled under certain agreements.  As a result of the transaction, the Company announced that it would be able to deconsolidate the NCSLT Trusts, and thereby simplify its consolidated financial statements.

104.    On November 17, 2011, the Company issued a press release announcing that it had received a notice from the Massachusetts ATB that GATE Holdings was properly taxable as a financial institution rather than a business corporation for each of the tax years at issue, among other findings.  Accordingly, the Company expected to recognize an income tax benefit during the fiscal quarter ending December 31, 2011 of approximately $12.5 and to make net tax payments for GATE Holdings' taxable years ended June 30, 2004, 2005 and 2006 of approximately $5 million.   The Company noted that if unsuccessful in its appeal, it could be required to make additional tax payments for GATE Holdings' taxable years ended June 30, 2008 and 2009, which could materially adversely affect its liquidity position.  The Company stated that it could not predict the timing of any such payments at that time.

105.    On January 3, 2012, the Company issued a press release reporting that the Company had re-gained compliance with the continued listing standards of the NYSE.

106.    On January 31, 2012, the Company issued a press release reporting results from the period ended December 31, 2011.  The Company reported net income of $1.19 billion or $10.82 per share, the increase in net income driven by the sale of the Company's variable interests in the NCSLT Trusts.  As a result of the sale, the Company reported deconsolidated assets totaling $6.6 billion and liabilities totaling $7.8 billion, resulting in a non-cash gain of $1.24 billion.  The Company further announced that as of December 31, 2011, the Company had $217.7 million in cash, cash equivalents and short-term investments.

107.    On February 9, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2011.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

108.    Regarding its tax liabilities, the Company stated:

We are subject to federal income tax, as well as income tax in multiple U.S. state and local jurisdictions. Our effective income tax rate is calculated on a consolidated basis. The securitization trusts are considered pass-through entities for income tax purposes and, accordingly, the net income or loss of the trusts is included in the tax returns of the trust owners rather than the trust entities themselves. As such, we record all income tax benefit or expense in our Education Financing segment.

The IRS has begun an audit of our tax returns for fiscal 2007, fiscal 2008, fiscal 2009 and fiscal 2010. In addition, we are involved in several matters before the ATB relating to the Massachusetts tax treatment of GATE, a former subsidiary of [FMD] . . . . Our state income tax returns in jurisdictions other than Massachusetts remain subject to examination for various fiscal years ended between June 30, 2007 and June 30, 2010.

Income tax benefit for the three and six months ended December 31, 2011 was $12.2 million and $11.4 million, respectively.  The benefit of $12.2 million recorded in the three months ended December 31, 2011 related to the order issued

by the ATB on November 9, 2011 related to the Massachus\*etts tax treatment of GATE.  Beginning in fiscal 2011, we no longer had any remaining taxes paid within available net operation loss carryback periods to offset our losses.  As a result, we recorded a deferred tax asset for net operating loss carry forwards as of December 31, 2011.  It is more likely than not that our deferred tax assets will not be fully realized through future reversals of existing taxable temporary differences or available tax planning strategies.  Accordingly, we have determined that a valuation allowance is necessary for all of our deferred tax assets not scheduled to reverse against existing deferred tax liabilities as of December 31, 2011.  In addition, we recorded accrued interest related to unrecognized tax benefits for the second quarter of fiscal 2012.  We will continue to review the realizability of deferred tax assets on a quarterly basis.

109.    On May 2, 2012, the Company issued a press release reporting results from the third quarter of fiscal 2012, the period ended March 31, 2012.  The Company reported net income of $9.9 million or $0.09 per share and income taxes payable of $23.7 million.

110.    On May 10, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2012.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

111.    Regarding the IRS audit, the Company stated in its May 2012 10-Q that:

As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007, fiscal 2008 and fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to audit a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax

refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of March 31, 2012, the IRS had not issued an notice of proposed adjustment in connection with its audit.

112.    On August 14, 2012, the Company issued a press release reporting results from the quarter and full year ended June 30, 2012.  The Company reported a net loss of $14 million, or $0.14 per share, for the fourth quarter, and a net loss of $38.9 million or $0.35 per share for the fiscal year ended June 30, 2012.

113.    On September 12, 2012, the Company filed its Annual Report on Form 10-K with the SEC for the period ended June 30, 2012.  The Company's Form 10-K was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

114.    Regarding the IRS audit, the Company stated in its fiscal 2012 10-K:

As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007 through fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to perform additional procedures, including an audit of a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of June 30, 2012, the IRS had not issued any notice of proposed adjustment in connection with its audit.

115.     On November 1, 2012, the Company issued a press release reporting results from the period ended September 30, 2012.  The Company reported a net loss of $13.9 million, or $0.14 per share and income taxes of $24 million.

116.     On November 8, 2012, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2012.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

117.     Regarding the IRS audit, the Company stated in its November 2012 10-Q:

As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007 through fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to perform additional procedures, including an audit of a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of September 30, 2012, the IRS had not issued any notice of proposed adjustment in connection with its audit.

118.     On February 7, 2013, the Company issued a press release reporting results from the period ended December 31, 2012.  The Company reported a net loss of $12.3 million or $0.12 per share and income taxes of $24.3 million.

119.    On February 8, 2013, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended December 31, 2012.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

120.    Regarding the IRS audit, the Company stated in its February 2013 10-Q:

As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007 through fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to perform additional procedures, including an audit of a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of December 31, 2012, as well as through the filing of this quarterly report on February 8, 2013, the IRS had not issued any notice of proposed adjustment in connection with its audit.

121.    On April 17, 2013, the ATB issued an opinion confirming the rulings and findings included in its earlier Order.

122.    On April 29, 2013, the Company issued a press release reporting results from the period ended March 31, 2013.  The Company reported a net loss of $8.8 million or $0.8 per share and income taxes of $24.6 million.

123.    On May 2, 2013, the Company issued a press release announcing that it had regained compliance with the NYSE's continued listing standards.

124.    On May 10, 2013, the Company filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2013.  The Company's Form 10-Q was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-Q included the Sarbanes-Oxley Certifications signed by the Officer and Director Defendants, substantially similar to the certifications described in paragraph 61 above.

125.    Regarding the IRS audit, the Company stated in its May 2013 10-Q:

As a result of the sale of the trust certificate of NC Residuals Owners Trust (the Trust Certificate), effective March 31, 2009, as well as our operating losses incurred in fiscal 2009, we recorded an income tax receivable for federal income taxes paid on taxable income in prior taxable years. In fiscal 2010, we received a total of $189.3 million in federal and state income tax refunds related to our income tax receivables. In April 2010, the Internal Revenue Service (IRS) commenced an audit of our tax returns for fiscal 2007 through fiscal 2009. Such audits are consistent with the practice of the Joint Committee of Taxation, which requires the IRS to perform additional procedures, including an audit of a taxpayer who receives a tax refund in excess of $2.0 million. In connection with this audit, the IRS is reviewing, among other things, the tax treatment of the sale of the Trust Certificate, including the related income tax refund previously received by us. The IRS has also expanded its audit to include our tax return for fiscal 2010 in light of the $45.1 million tax refund that we received in October 2010. We cannot predict the timing or outcome of the IRS audit. As of March 31, 2013, as well as through the filing of this quarterly report on May 10, 2013, the IRS had not issued any notice of proposed adjustment in connection with its audit.

**The Truth Emerges**

126.    On August 15, 2013, the Company issued a press release to announce its quarterly results for the fiscal year ended June 30, 2013.  The release was a shock to the investment community because the Company disclosed for the first time that it expected to receive a NOPA from the IRS that would seek to disallow not only the loss that generated the massive tax refunds the Company received but also would hold the Company liable for taxes on income generated by the Trust Certificate after the Company had purportedly "sold" it.  Thus, the Company disclosed

that its tax liability related to the IRS audit was estimated to be more than $300 million, which

amounted to more than seven times the Company's total revenue for all of fiscal 2012. The press

release stated:

> our federal income tax returns have been under audit by the Internal Revenue
> Service (the "IRS") in connection with the sale of the trust certificate of the NC
> Residual Owners Trust ("Trust Residuals"). As part of that audit process, the
> Company expects to receive a Notice of Proposed Adjustment ("NOPA").  The
> NOPA, when issued, is an initial IRS position and not a final determination, and
> as a result, does not require payment of tax at this time.
>
> The Company expects that the NOPA would seek to disallow the loss that
> generated the tax refunds previously received by the Company as well as require
> the Company to include in its tax returns any taxable income of the Trust
> Residuals from the March 31, 2009 sale date through June 30, 2011.   The
> disallowance of the loss, coupled with the additional taxable income after the sale
> date, creates a proposed adjustment which we estimate to be approximately $300
> million plus interest.
>
> The Company continues to believe that its position is a strong one and intends to
> vigorously contest any proposed adjustment.   The Company has evaluated the
> information expected to be included in the NOPA and has concluded that it does
> not change the Company's assessment of the ultimate outcome of this matter and,
> in accordance with relevant accounting guidance, the Company has not recorded
> an accrual for this matter in its consolidated financial statements.

127.    The Company held a conference call for investors on August 15, 2013. During the

conference call, Defendant Meyers stated that "[d]uring fiscal year 2013, we've made substantial

progress executing on our business plan." Defendant Klipper stated that the Company's "balance

sheet remains liquid with approximately $137 million in cash, cash equivalents and short-term

investments."

128.    Addressing the IRS audit on the August 15, 2013 conference call, Defendant

Klipper downplayed the IRS findings:

> because of the size of the tax refunds that were issued to us in fiscal 2010 and
> fiscal 2011, our federal income tax returns have been under audit by the IRS.  As
> part of that audit process, we expect to receive a Notice of Proposed Adjustment

or NOPA, which will state an initial IRS position that our sale of the trust residuals in fiscal 2009 would not be recognized for income tax purposes.

The NOPA is a recommendation of the reviewing agent in the IRS field office and, as such, is an initial position and not a final determination.

Once the recommendation is fixed, the company can challenge that adjustment in the IRS appeal section and, if unsuccessful, can litigate the adjustment in court.

This process, however, can be lengthy. Upon finalization and receipt of the NOPA, which we expect will be 60 to 90 days from now, we will make the appropriate disclosures. We expect that the NOPA would seek to disallow the loss of generated tax refunds, as well as require the company to include in its tax returns any taxable income with a trust residuals on a March 31, 2009 sale date through June 30, 2011, which is the last fiscal year under exam by the IRS.

The disallowance of the loss, coupled with the additional taxable income after the sale date, creates an IRS estimate of approximately $300 million plus interest. We believe that our position is a strong one. And we will vigorously contest any proposed adjustments.

We have worked with outside tax counsel as part of the completion of our year-end consolidated financial statements, and have determined that the information expected to be included in the NOPA will not change the company's assessment of the ultimate outcome in this matter.

Consequently, the company does not deem it necessary, in accordance with relevant accounting guidance, to have an accruals risk matter in this consolidated financial statement, which it expects to file in early September.

129.   Immediately following the disclosure of the scope of the IRS's request for back taxes from the Company, FMD's share price declined $0.57 per share on this news, closing at $1.00 after unusually active trading. That decline represented more than 35% decline in the Company's value in a single day.

130.   On September 10, 2013, the Company received two NOPAs from the IRS. In the NOPAs, the IRS asserts that the Company's "sale" of the Trust Certificate should not be recognized for Federal income tax purposes because the Company retained the economic benefits and burdens of the Trust Certificate, including retaining certain repurchase rights and

data rights.  The IRS concludes that the transaction should have been characterized as a financing and not as a sale.  The IRS asserts that the sale of the Trust Certificate and the execution of the Asset Services Agreement had the impact of converting taxable income to the owner from an accrual basis to a cash basis.  As a result, the NOPAs propose to disallow the loss that generated the tax refunds that the Company previously received. The NOPAs also seek to require the Company to include income from the Trust Certificate from the March 31, 2009 sale date through June 30, 2011 in its taxable income for those years.

131.    On September 13, 2013, the Company filed its Annual Report on Form 10-K with the SEC for the fiscal year ended June 30, 2013.  The Company's Form 10-K was signed by the Officer and Director Defendants and reaffirmed the Company's previously announced financial results.  The Company's Form 10-K included Sarbanes-Oxley-required certifications signed by the Officer and Director Defendants similar in substance to the certifications described in paragraph 61 above.

132.    In its fiscal 2013 10-K, the Company indicated that its loss from continuing operations for fiscal 2013 improved $3.6 million or 7% from the previous year.

133.    With regard to the IRS audit, the Company stated in its 2013 10-K that:

Our federal income tax returns have been under audit by the Internal Revenue Service, or IRS, in connection with the sale of the trust certificate to NC Residual Owners Trust, which we refer to as the Trust Certificate.  In connection with the sale of the Trust Certificate, FMD entered into an Asset Services Agreement . . . pursuant to which FMD provided various consulting and advisory services to the purchaser of the Trust Certificate.  We announced on August 15, 2013, that, as part of that audit process, we expected to receive a Notice of Proposed Adjustment, or NOPA, from the IRS.  On September 10, 2013 we received two NOPAs from the IRS that contain the proposed adjustments that we announced on August 15, 2013.  In the NOPAs, the IRS asserts that our sale of the Trust Certificate, including, among other things, retaining certain repurchase rights and data rights.  The IRS further concludes that the transaction should be characterized as a financing instead of a sale and asserts that the sale of the Trust Certificate and the execution of the Asset Services Agreement had the impact of

converting taxable income to the owner from an accrual basis to a cash basis. As a result, the NOPAs propose to disallow the loss that generated the tax refunds that we previously received as well as require us to include income from the Trust Certificate from the March 31, 2009 sale date through June 30, 2011 in our taxable income for such years. If the IRS' positions are successful, the disallowance of the loss, coupled with the additional taxable income after the sale date through June 30, 2011, would create federal income tax adjustments that we estimate to be approximately $300.0 million plus interest, with the interest continuing to accrue until the matter is resolved. The NOPAs do not address tax years beyond June 30, 2011. The NOPAs are only initial IRS positions and not final determinations and, as a result, do not require any tax payment at this time. We did not record an accrual for hits matter in our consolidated financial statements at June 30, 2013 or when we received the NOPAs. We plan to vigorously contest the proposed adjustments and we believe we have a strong position as it relates to this matter.

134.    The Company further stated in the 2013 10-K:

Although we believe that our capital resources as of June 30, 2013, which include proceeds of tax refunds under audit, are sufficient to satisfy our operating needs for the succeeding 12 months, we cannot assure you that they will be sufficient, particularly in light of ongoing federal and state income tax audits. . . .

135.    Additionally, the Company acknowledged that: "The ongoing IRS audit or any other investigation, audit, appeals proceeding or suit relating to the sale of the Trust Certificate could result in substantial costs. A state taxing authority could also challenge our tax position in connection with the transactions, notwithstanding our receipt of any income tax refund."

136.    The Company further stated in its 2013 10-K that:

Although we believe that our capital resources as of June 30, 2013, which include proceeds of tax refunds under audit, are sufficient to satisfy our operating needs for the succeeding 12 months, we cannot assure you that they will be sufficient, particularly in light of ongoing federal and state income tax audits. . . . . If the IRS' positions are successful, the disallowance of the loss, coupled with the additional taxable income after the sale date through June 30, 2011, would create federal income tax adjustments that we estimate to be approximately $300.0 million plus interest, with the interest continuing to accrue until the matter is resolved.

Insufficient funds could require us to delay, scale back or eliminate certain of our products, eliminate our ability to provide credit enhancement commitments to

prospective clients . . . terminate personnel, further scale back our expenses or cease operations.

137.    In the 2013 10-K, the Company indicated that: "If we are unsuccessful in an appeal of the ATB Order, we could be required to make additional tax payments, including interest for GATE's taxable years ended June 30, 2008 and 2009, which could materially adversely affect our liquidity position."

138.    The Company's 2013 10-K disclosed that the Company had cash, cash equivalents and short-term investments of $137.1 million at June 30, 2013.

139.    On September 23, 2013, FMD was notified by NYSE Regulation that the average closing price of the Company's common stock over a consecutive 30-trading-day period had fallen below the NYSE's continued listing standard of $1.00 per share.  The Company had a period of six months from the date of notice to satisfy the average share price requirement.

140.    On September 27, 2013, the Company issued a press release indicating that on September 23, 2013, it received written notice from NYSE Regulation that the Company was not in compliance with one of the continued listing standards of the NYSE, which require an average closing price of not less than $1.00 per share over a consecutive 30-day trading period.  As of September 20, 2013, the average closing price of the Company's common stock over a consecutive 30-day period was $0.98 per share.

141.    On November 12, 2013, FMD's stockholders approved a 1-for-10 reverse stock split of the Company's common stock, which was effected on December 2, 2013, when the shares of common stock decreased from 250,000,000 to 25,000,000 shares.

142.    On February 10, 2014, the Company announced its second quarter financial results.  The Company announced that it recorded a net loss of $76 million or $0.68 per share.  It claimed that its financial results had improved from the prior year.  The Company announced too

49

that its liquidity continued to decline.   The Company had only $101 million in cash, cash equivalents and short-term investments compared to $117 million at the end of the prior quarter.

143.    The Company's second quarter 10-Q showed that its cash and cash equivalents on hand decreased from $81.9 million at the end of June 2013 to $49.8 million at the end of December 2013.

144.    The Company reiterated its description of the IRS audit related to the sale of the Trust Certificate:

> The NOPAs are proposed recommendations of the reviewing agent in the IRS field office and, as such, are initial IRS positions and not final determinations, and, as a result, do not require any tax payment at the time of issuance. We have considered the requirements of Accounting Standards Codification, or ASC 740, *Income Taxes*, or ASC 740, and the impact of the NOPAs, along with other information supporting our overall tax position, in our assessment of the ultimate outcome of this matter with the IRS, and based on our analysis, we did not record an accrual related to this matter in our unaudited consolidated financial statements at December 31, 2013.   Such an accrual, if it becomes necessary, could be significant and material to our consolidated financial statements.

145.    The Company indicated that it was "vigorously" contesting the proposed adjustments and claimed that it had "a strong position as it relates to this matter."   It further noted that the process of resolving the issue, which could include appeals process and litigation in the U.S. Tax Court and/or the U.S. Court of Appeals, could extend over multiple years.

146.    With regard to its capital resources, the Company stated:

> Although we believe that our capital resources as of December 31, 2013, which include proceeds of tax refunds under audit, are sufficient to satisfy our operating needs for the succeeding 12 months, we cannot assure you that they will be sufficient.   In particular, we announced on August 15, 2013, as part of the audit process, we expected to receive a NOPA from the IRS.   On September 10, 2013, we received two NOPAs from the IRSS that contain the proposed adjustments that we announced on August 15, 2013.   The NOPAs propose to disallow the loss that generated the tax refunds that we previously received as well as require us to include income from the Trust Certificate from the March 31, 2009 sale date through June 30, 2011 in our taxable income for such years. If the IRS' positions are successful, the disallowance of the loss, coupled with the additional taxable

income after the sale date through June 30, 2011, would create federal income tax adjustments that we estimate to be approximately $300.0 million, excluding interest until such matter is resolved and the assessment of penalties, if any.

147.    FMD's common stock closed at $6.45 on February 19, 2014.

## V.    CLASS ACTION ALLEGATIONS

148.    Plaintiffs bring this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of itself and a Class consisting of all who purchased or otherwise acquired securities issued by FMD during the Class Period and who suffered damages as a result.  The Officer and Director Defendants and the other officers and directors of the Company are excluded from the proposed Class, as are their families, legal representatives, heirs, successors, assigns and/or any entities in which the Defendants have or had a controlling interest.

149.    Members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FMD securities were actively traded on the NYSE. While the exact number of Class members is presently unknown to Plaintiffs, it can be ascertained through discovery.  Plaintiffs believe that there are hundreds or thousands of potential Class members.  Record owners of the Company's securities may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

150.    Plaintiffs' claims are typical of the claims of the other Class members as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal law.

151.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained experienced counsel competent and experience in class action and securities litigation.  Plaintiffs have no interests adverse to any other potential Class members.

152.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  These include:

•    whether Defendants violated federal securities laws through the acts alleged herein;

•    whether Defendants' publicly disseminated statements during the Class Period omitted or misrepresented material facts;

•    whether the sale of the Trust Certificate was a sham transaction;

•    whether Defendants knowingly or recklessly defrauded the IRS;

•    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Company's business and operations;

•    whether the Officer and Director Defendants caused the Company to issue false and misleading financial statements during the Class Period;

•    whether prices of the Company's securities were artificially inflated due to Defendants' actions described in this Complaint; and

•    to what extent the members of the Class has sustained damages and, if so, what is the proper damage measure.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable.  Furthermore, the damages suffered by individual Class members may be relatively small, so that the expense and burden of individual litigation would make it impossible for Class members to individually pursue claims against FMD for the damages they suffered. There should be no difficulty managing this case as a class action.

## VI.    LOSS CAUSATION

154.    During the Class Period, as detailed herein, Defendants engaged in both a scheme to deceive the market and a course of conduct that artificially inflated the price of FMD shares and operated as a fraud on Class Period purchasers of FMD shares by failing to disclose and

misrepresenting the adverse facts alleged herein. As Defendants' misrepresentations and omissions and fraudulent conduct were disclosed and became apparent in the market, the price of FMD shares declined significantly.

155. As a result of their FMD share purchases during the Class Period, Plaintiffs and the Class members suffered economic losses under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused FMD shares to trade at artificially inflated levels throughout the Class Period.

156. By concealing the adverse facts described herein from investors, Defendants presented a misleading picture of FMD's business and prospects. As the truth about the Company was revealed to the market, FMD's share price fell significantly. These declines removed the inflation from the FMD share price, causing real economic loss to investors who had purchased FMD shares during the Class Period.

157. The declines in the FMD share price after the disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in FMD shares negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

158. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of FMD shares and the subsequent significant decline in the value of FMD shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.    CONTROL PERSON LIABILITY

159.    The Officer and Director Defendants are liable as direct participants with respect to the wrongs complained of herein.  In addition, the Officer and Director Defendants, by reason of their status as senior management, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act as each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Officer and Director Defendants were able to, and did directly or indirectly, control the conduct of FMD's business.

160.    Specifically, because of their positions with the Company, the Officer and Director Defendants possessed the power and authority to control the content of FMD's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market including those containing the materially false and misleading statements and omission of material fact described herein.  Each of the Officer and Director Defendants, by reason of his respective management and Board positions, had the ability and opportunity to review copies of FMD's SEC filings, reports, and press releases alleged herein to be misleading, prior to, or shortly after their issuance, or to cause them to be corrected.

161.    By virtue of their positions, the Officer and Director Defendants had access to material non-public information.   Each of the Officer and Director Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public; and that the positive representations which were being made were then materially false and misleading.

## VIII.   FRAUD ON THE MARKET PRESUMPTION

162.    At all relevant times, the market for FMD's publicly traded securities was an efficient for the following reasons:

    a.   FMD shares were listed and actively traded on the NYSE, a highly efficient market;

    b.   As a registered and regulated issuer of securities, FMD filed periodic public reports with the SEC, in addition to frequent voluntary disseminations of information;

    c.   FMD regularly communicated with public investors through established market communications mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other reporting services; and

    d.   The market reacted to public information disseminated by FMD;

    e.   FMD was followed by securities analysts employed by major brokerage firms who wrote reports that were disclosed and distributed to the brokerage firms and their sales force and customers.  These reports were publicly available and entered the public marketplace;

    f.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of FMD securities; and

    g.   Without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired FMD securities between the time the Defendants made or omitted the material misrepresentations and omission and the time that the truth was revealed, during which time the price of FMD securities was artificially inflated by Defendants' misrepresentations and omissions.

163.    As a result, the market for FMD shares promptly digested current information regarding FMD from all publicly available sources and reflected such information in the share price.  Under these circumstances, all FMD share purchasers during the Class Period suffered similar injury as a result of their purchases of FMD shares at artificially inflated prices and a presumption of reliance arises.

## IX.   *AFFILIATED UTE* PRESUMPTION

164.   At all relevant times, Plaintiffs and the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the Class would not have purchased or otherwise acquired FMD securities at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent Defendants wrongfully failed to disclose material information concerning FMD's expected tax liabilities that greatly exceeded the Company's ability to pay during the relevant period and the fact that the Company had not reserved any funds to pay these expected liabilities, Plaintiffs are presumed to have relief on Defendants' omissions as established by the Supreme Court in *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

## X.   NO STATUTORY SAFE HARBOR

165.   As alleged herein, Defendants acted with scienter because, at the time that they issued public documents and other statements in FMD's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and omissions; and knowingly and/or recklessly participated in the issuance and/or disseminations of such statements and/or documents as primary violators of the federal securities laws.

166.   As set forth in detail above, the Officer and Director Defendants, by virtue of their control over, and/or receipt of FMD's materially misleading statements, and/or their associations with the Company which made them privy to confidential, proprietary information concerning FMD which was used to artificially inflate financial results and which the Officer and Director

Defendants caused or were informed of, participated in, and knew of the fraudulent scheme alleged herein. With respect to non-forward looking statements and/or omissions, the Officer and Director Defendants knew and/or recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

167.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made and/or were statements of present and/or historical fact.   Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.   Moreover, meaningful statements did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statement.

168.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those forward-looking statements because at the time each of those statements were made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized or approved by an executive officer of FMD who knew that those statements were false or misleading when made.   None of the historical or present tense statements made by Defendants were an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI.    CAUSES OF ACTION

### COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

169.    Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

170.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a)  and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against FMD and the Officer and Director Defendants. FMD and the Officer and Director Defendants (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

171.    FMD and the Officer and Director Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

172.    FMD and the Officer and Director Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false and misleading.  Defendants' scienter is shown by, inter alia:

a. Defendant Meyer's solicitation and receipt of extraordinary compensation, including a "special bonus" and fully vested stock units, in connection with his role in arranging and effecting the fraudulent Trust Certificate Transaction, as alleged in paragraph 41 above.

b. Defendant Meyer had previously engaged in questionable behavior in connection with his personal financial dealings concerning FMD.  In *Robert and Ardis James Foundation v. Meyers*, a case filed in 2006 and tried five years later, the Suffolk Superior Court ruled that Defendant Meyers violated good faith and fair dealing requirements with respect to a deal between Defendant Meyers and a business associate involving FMD stock.   The Superior Court awarded an amount expected to total approximately $45 million.

173.    Directly or indirectly in the preparation or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media,  Defendants made statements that were designed to influence the market for FMD securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about FMD's finances and business prospects.   As a result of FMD and the Officer and Director Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

174.   FMD is liable for the acts of the Officer and Director Defendants under the doctrine of *respondeat superior*, as the Officer and Director Defendants were acting as the officers, directors, and/or agents of FMD in taking the actions alleged herein.

175.   Plaintiffs and the Class purchased  FMD securities without knowing that FMD and the Officer and Director Defendants had misstated or omitted material facts about the Company's financial performance or prospects.   In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements by FMD and the Officer and Director Defendant, and/or an absence of material adverse information that was known to FMD and the Officer and Director Defendants, or recklessly disregarded by them but not disclosed in FMD's and the Officer and Director Defendants' public statements.   Plaintiffs and the Class were damaged as a result of their reliance on FMD's and the Officer and Director Defendants' false statements and misrepresentations and omissions of material facts.

176.   Defendants' statements were materially false or misleading when made because Defendants misrepresented or failed to disclose that: (a) the Company's tax treatment for its sale of the Trust Certificate and similarly situated securities was inappropriate; (b) such treatment exposed the Company to significant liability that the Company was incapable of paying; (c) the Company lacked adequate internal controls over financial reporting; and (d) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

177.   At the time of FMD and the Officer and Director Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware that they were disseminating false and misleading information and believed the information to be true.

Plaintiffs and the Class would not otherwise have purchased FMD securities had they known the truth about the matters discussed above.

178.     Plaintiffs are filing this action within two years of discovery of the facts constituting the violation, including the facts establishing scienter and the other elements of Plaintiffs' claim, and within five years after the violations with respect to Plaintiffs' investments.

179.     By virtue of the foregoing, FMD and the Officer and Director Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

180.     As a direct and proximate result of FMD and the Officer and Director Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of FMD securities during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange
Act Against the Officer and Director Defendants**

181.     Plaintiffs repeat and re-allege the allegation set forth above as if fully set forth herein.

182.     Each of the Officer and Director Defendants, by reason of their status as senior executive officers and directors of FMD, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.     The Officer and Director Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class' investments in FMD securities within the meaning of §20(a) of the Exchange Act. Therefore, the Officer and Director Defendants are jointly and severally liable for the Company's fraud as alleged herein.

183.    The Officer and Director Defendants knew or recklessly disregarded the fact that FMD's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Officer and Director Defendants did not act in good faith.

184.    By virtue of their high-level positions and their participation in, and awareness of, FMD's operations and public statements, the Officer and Director Defendants were able to and did influence and control FMD's decision-making, including controlling the content and determination of the documents that Plaintiffs and the Class contend contained materially false and misleading information on which Plaintiffs and the Class relied.

185.    The Officer and Director Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

186.    As set forth above, FMD and the Officer and Director Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons of FMD, holding positions as officers and directors of FMD, the Officer and Director Defendants had the power and authority to cause FMD to engage in the wrongful conduct complained of herein. By reasons of such conduct, the Officer and Director Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed.

187.    As a direct and proximate result of the Officer and Director Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of FMD securities.

## XII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs on behalf of themselves and the Class, pray for relief and judgment, as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying, under Rule 23, Plaintiffs as Class representative and Plaintiffs' counsel as Class Counsel;

B.  Awarding compensatory damages to Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees; and

D.  Awarding such other and further relief as may be just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  February 20, 2014                    Respectfully submitted,


                                             /s/ Leslie R. Stern
                                             Leslie R. Stern (BBO #631201)
                                             BERMAN DeVALERIO
                                             One Liberty Square
                                             Boston, MA 02109
                                             Tel:  (617) 542-8300
                                             Fax:  (617) 542-1194
                                             lstern@bermandevalerio.com

Todd S. Collins
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3040
Fax: (215) 875-4604

Kurt B. Olsen
Klafter Olsen & Lesser LLP
1250 Connecticut Avenue, N.W.
Suite 200
Washington, DC  20036
Tel:  (202) 261-3553
Fax: (202) 261-3533

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Leslie R. Stern, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 20, 2014.

/s/ *Leslie R. Stern*
Leslie R. Stern