UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
RYAN M. SMITH, ATLAS CAPITAL        )
MANAGEMENT, L.P., ATLAS CAPITAL,    )
L.P., and ATLAS ADVANTAGE           )
MASTER FUND, L.P., individually     )
and on behalf of all others         )
similarly situated,                 )
            Plaintiffs,             )
                                    )   Civil Action 13-12121-PBS
        v.                          )
                                    )
THE FIRST MARBLEHEAD CORP.,         )
DANIEL MEYERS, and KENNETH          )
KLIPPER,                            )
            Defendants.             )
                                    )
```

## MEMORANDUM AND ORDER

October 28, 2014

Saris, U.S.D.J.

### I. INTRODUCTION

In this proposed class action, plaintiffs contend that First Marblehead Corporation (FMD) and two of its executives violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by misrepresenting the nature of a 2009 transaction and its tax consequences. Defendants move to dismiss, arguing that plaintiffs have not met the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA). See 15 U.S.C. § 78u-4(b)(1)-(2). After hearing, Defendants' Motion to Dismiss (Docket No. 31) is **ALLOWED**.

1

## II. FACTUAL BACKGROUND

The facts alleged in the First Amended Complaint are taken as true for purposes of this motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 667 (2009).

First Marblehead Corporation is a Boston-based company whose shares trade on the New York Stock Exchange. Daniel Meyers, the company's co-founder, served as its Chief Executive Officer and President at all times relevant to this action. Kenneth Klipper, a Certified Public Accountant, has been FMD's Chief Financial Officer and Managing Director since September 2008.

Before the 2008 financial crisis, FMD's business centered around the origination and securitization of private student loans. The company provided services to special purpose statutory trusts that acquired student loans from lenders and issued asset-backed securities. In exchange for these services, FMD was entitled to structural advisory fees and residual interests in the net cash flows from the trusts. GATE Holdings, Inc., a wholly-owned subsidiary of FMD, held FMD's title to these residual interests in securities trusts. In the first half of the 2000s, the bulk of FMD's cash flow came from these structural advisory fees and residuals.

Starting in 2008, FMD's education loan portfolios and the portfolios held by the trusts experienced high rates of default as a result of the economic downturn. In response, the company

overhauled its business model. In March 2009, FMD converted GATE Holdings, Inc. into a trust (called the NC Residuals Owners Trust), and sold its ownership interest in the trust to VCG Owners Trust ("the VCG Transaction"). As part of this transaction, FMD also entered into an Asset Services Agreement with VCG, agreeing to provide advisory and consulting services in return for an asset servicing fee calculated as a percentage of the aggregate outstanding principal balance of loans outstanding in the trusts.

FMD announced the VCG transaction on April 6, 2009 via a Form 8-K filing and press release. According to the press release, the "sale" of FMD's ownership interest in the NC Residuals Owners Trust was "expected to generate a cash refund for taxes previously paid, as the Company has been required to pay taxes on the *expected* cash flows from the [special purpose statutory trusts] before it actually receives those cash flows." (emphasis added). Similarly, the Form 8-K stated that FMD expected the "sale" to result in a "refund for taxes previously paid" as well as to "eliminate any tax on such income in the future."

The April 2009 Form 8-K filing and press release also announced an Asset Services Agreement with VCG. Under this agreement, FMD promised "to provide certain portfolio services." In exchange, FMD would receive an "annual fee based on the

3

aggregate outstanding principal balance of the student loans owned by the [special purpose statutory trusts]," which "will not be paid until residual cash flows are distributed by the [trusts]." FMD's share price climbed in reaction to the announcement of the VCG Transaction, closing 44% above the previous trading day's share price.

The press release included a "Safe Harbor Statement" noting in part that "inclusion of this forward-looking information should not be regarded as a representation by us or any other person that the future results, plans, estimates or expectations contemplated by us will be achieved. In particular, the U.S. federal and state income tax consequences arising in connection with the transactions . . . are complex and uncertain."

In its successive public filings, FMD continued to emphasize the tax benefits of the VCG transaction. On May 8, 2009, FMD repeated that it "expected" to receive a cash refund and eliminate future tax obligations as a result of the transaction with VCG. In November 2009, FMD announced that the "sale of the Trust Certificate, coupled with operating losses for fiscal 2009," resulted in the receipt of a $176.6 million tax refund from the IRS.

FMD also continued to warn, however, that the tax benefits from the VCG transaction were not guaranteed. In its May 2009 quarterly filing, FMD stated that the tax consequences of the VCG

4

transaction are "complex and uncertain," explaining that if the IRS or a state taxing authority successfully challenged FMD's tax position, the company's "near-term financial condition and liquidity would be materially adversely affected." Similarly, FMD warned investors in November 2009, "Our actual liquidity . . . may depend on a number of factors, including . . . the expected consequences of the sale of the Trust Certificate." The September 2009 Form 10-K added that "our failure to realize the tax benefits we expect from the sale of the Trust Certificate" could cause FMD's stock price to "fluctuate substantially" and result in investor losses. In this and the next quarterly filing, FMD reiterated that the tax consequences of the VCG transaction are "complex and uncertain" and stated that challenges to the tax treatment of the transaction could "materially affect" the company's liquidity and financial results.

In April 2010, the Internal Revenue Service (IRS) commenced an audit of FMD's tax returns for 2007, 2008, and 2009. The company disclosed the audit in its May 2010 quarterly filing. The May 2010 10-Q noted:

> In the first nine months of fiscal 2010, we received $189.3 million in federal and state tax refunds on income taxes previously paid by us on prior taxable income. The refunds resulted from our losses from operations and the sale of the Trust Certificate [to VCG]. During the third quarter of fiscal 2010, the Internal Revenue Service, or IRS, began an audit of our federal tax returns for fiscal 2007, 2008, and 2009. The IRS or a state taxing authority could challenge our tax positions in connection with the transactions, notwithstanding our receipt of any tax refund.

The final page of the 10-Q includes this statement, in bold and italicized font: "***Our liquidity could be adversely affected if the sale of the Trust Certificate does not result in the tax consequences that we expect.***"

That same month, FMD's board of directors approved a special bonus of $2 million to CEO Meyers, granted him stock units worth over $4 million, and raised his base salary to $800,000. Before February 2008, FMD's former CEO had received $1,000,000 in base salary. Meyers had spent the previous two years working for annual compensation of one dollar. The company announced Meyers's bonus and increased salary in a Form 14A proxy statement issued on September 9, 2010, crediting Meyers with "significantly improving the viability of the Company" through, among other initiatives, "the potential elimination of an estimated $430,000,000 in additional taxes over the remaining life of the NCSLT Trusts."

In its September 2010 10-K annual filing, FMD reminded investors that the IRS "commenced an audit of our tax returns for fiscal years 2007, 2008, and 2009," but that FMD "cannot predict the timing or outcome of the audit." FMD's outside auditor, KPMG, had issued opinions stating that the company's financial statements were prepared in conformity with U.S. accounting principles and "fairly present[ed], in all material respects, the financial position of the Company." As it had done since the VCG

Transaction was first announced in April 2009, FMD characterized the tax consequences of the transaction as "complex and uncertain." The company warned that the IRS audit could result in "adjustments to tax refunds previously received in connection with the sale of the Trust Certificate" and "substantial costs" related to any "investigation, audit, or suit" in connection with the sale. In each quarterly statement from November 2010 until August 2013, FMD reiterated either verbatim or in substantially similar terms that the tax consequences of the VCG transaction were uncertain, that the IRS had undergone an audit of the company's tax returns, that FMD could not predict when it would receive the results of the audit, and that challenges to the income tax treatment of the transaction could result in substantial costs for the company. Additionally, in the Form 10-K Annual Reports filed in September 2011 and September 2012, FMD stated that its stock price could "fluctuate substantially" and be "volatile" in response to an unfavorable outcome in the IRS audit.

By August 15, 2013, signs of trouble were flagged. FMD notified investors in a 10-Q filing and investor conference call on this date that the IRS would seek to disallow the tax refunds from the VCG Transaction:

> As previously disclosed, our federal income tax returns have been under audit by [the IRS] in connection with the sale of the trust certificate of the NC Residual Owners Trust . . . As part of that audit process, [FMD] expects to receive a

7

> Notice of Proposed Adjustment ("NOPA"). The NOPA, when issued, is an initial IRS position and not a final determination, and as a result, does not require a payment of tax at this time.
>
> The Company expects that the NOPA would seek to disallow the loss that generated the tax refunds previously received by the Company . . . The disallowance of the loss, coupled with the additional taxable income after the sale date, creates a proposed adjustment which we estimate to be approximately $300 million plus interest.
>
> The Company continues to believe that its position is a strong one and intends to vigorously contest any proposed adjustment.

During a conference call with shareholders, CFO Klipper reiterated the statement from the 10-Q, adding, "The NOPA is a recommendation of the reviewing agent in the IRS field office and, as such, is an initial position and not a final determination. Once the recommendation is fixed, the company can challenge that adjustment . . . This process, however, can be lengthy." CEO Meyers added after Klipper's remarks: "Management's view on the IRS matter are [sic] straightforward. Since the beginning of the IRS exam in April 2010, each quarter, we have discussed and updated this issue on our public filings. The NOPA we are expecting to receive is just the next step in a long process . . . We will take all available steps to resolve this matter favorably." Immediately following these disclosures, FMD's share price declined more than 35% in a single day, "closing at $1.00 after unusually active trading."

FMD received two NOPAs from the IRS on September 13, 2013.

In its fiscal 2013 10-K filing, released the same day, FMD reported to investors that the NOPAs concluded that the VCG Transaction should not have been characterized as a sale because FMD retained the economic benefits and burdens of the NC Residuals Owners Trust, including certain repurchase rights and data rights. The NOPAs also stated that the VCG Transaction "should have been characterized as a financing instead of a sale" and that FMD's Asset Services Agreement with VCG "had the impact of converting taxable income to the owner from an accrual basis to a cash basis." FMD acknowledged that the audit and appeals process "could result in substantial costs" to the company, and that although "we believe that our capital resources as of June 30, 2013 . . . are sufficient to satisfy our operating needs for the succeeding 12 months, we cannot assure you that they will be sufficient, particularly in light of ongoing federal and state income tax audits." FMD made similar disclosures in its February 10, 2014 10-Q, reiterating its description of the IRS audit and NOPAs and warning about the potential impact of any adjustments on the company's liquidity.

Between June 2013 and December 2013, FMD's cash and cash equivalents declined precipitously. On September 23, the New York State Exchange Regulation notified the company that it was not in compliance with the NYSE's continued listing standard, which requires an average closing price of not less than $1.00 per

9

share over a consecutive 30-day trading period. FMD's stockholders approved a 1-for-10 reverse stock split of the company's common stock on November 12, 2013. The split was effected on December 2, 2013, decreasing the shares of common stock from 250 million to 25 million. On February 19, 2014, FMD's stock closed at $6.45 per share. The complaint does not indicate whether the IRS's proposed adjustments have become final, or whether FMD has appealed the IRS's findings. FMD has stated, however, that it plans to "vigorously contest the proposed adjustments and we believe we have a strong position as it relates to this matter."

### III. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "possess enough heft" to state a claim to relief that is plausible on its face. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007). Allegations of Section 10(b) violations are subject to the "exacting pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA). <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007). Congress enacted the PSLRA as a "check against abusive litigation by private parties." <u>Id.</u> To that end, the PSLRA's heightened pleading requirement "erect[s] a significant hurdle for a plaintiff to clear before her complaint can survive a motion to dismiss." <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512

10

F.3d 46, 56 (1st Cir. 2008). The PSLRA requires plaintiffs alleging Section 10(b) violations to specify and state with precision the facts constituting false statements and the facts evidencing a "strong inference" of scienter. 18 U.S.C. § 78u-4(b)(1)-(2). Because the complaint sounds in fraud, it also must clear Rule 9(b). Fed. R. Civ. P. 9(b) (plaintiffs must "state with particularity the circumstances constituting fraud").

As with any Rule 12(b)(6) motion, the Court accepts the factual allegations as true, drawing all reasonable inferences in the plaintiffs' favor. ACA Fin. Guar. Corp., 512 F.3d at 58. The Court may supplement those factual allegations by examining "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

## IV. DISCUSSION

### A. Section 10(b) Claim

Plaintiffs argue that they are entitled to damages under section 10(b) of the Securities Exchange Act of 1934 because defendants made four general types of misleading statements to investors concerning: (1) whether the VCG Transaction would entitle FMD to tax refunds; (2) the structure of the VCG Transaction; (3) the purpose and extent of the IRS audits; and (4) FMD's earnings and finances. According to the plaintiffs, the "thrust" of their case is that FMD "intentionally accounted for

11

the Trust Certificate Transaction as a sale, knowing that it violated [Generally Accepted Accounting Principles], in order to obtain undeserved tax benefits." Further, once the IRS began the audit of FMD in April 2010, plaintiffs contend that defendants intentionally led investors to believe that this was "a routine audit based on the size of the refunds received and not, as was in fact the case, an investigation of the Company's improper accounting of the Trust Certificate Transaction."

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ" of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the SEC pursuant to section 10(b), makes it unlawful to employ any device or engage in any act to defraud, or to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances they were made, not misleading." 17 C.F.R. § 240.10b-5.

To survive a motion to dismiss a section 10(b) claim, a plaintiff must sufficiently allege six elements: (1) a material misrepresentation or omission; (2) state of mind, or scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharm.,

Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); In re Boston Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012). Defendants argue that plaintiffs have not sufficiently pleaded the second element, scienter.[1] The Court agrees.

Section 10(b)'s scienter requirement is satisfied where plaintiffs allege facts sufficient to create a strong inference of "fraudulent intent or knowing or reckless disregard of [the defendant's] obligation to disclose." In re Boston Sci. Corp. Sec. Litig., 686 F.3d at 29 (citing Auto. Indus. Pension Trust Fund v. Textron, Inc., 682 F.3d 34, 38-39 (1st Cir. 2012)). At the pleading stage, a "strong inference" of scienter is one that is "more than merely plausible or reasonable–it must be cogent and *at least as compelling as any opposing inference* of non-fraudulent intent." Tellabs, 551 U.S. at 314 (emphasis added). In other words, where inferences for and against scienter hang evenly balanced, Tellabs "awards the draw to the plaintiff." ACA Fin. Guar. Corp., 512 F.3d at 59. In comparing inferences, the Court evaluates the plaintiffs' complaint holistically, drawing

---

[1] Defendants also assert that the amended complaint does not adequately allege the first element, material misrepresentation, or the sixth element, loss causation. Additionally, defendants argue that the vast majority of the challenged statements were forward-looking and accompanied by meaningful cautionary language, thereby activating a statutory safe harbor. See 15 U.S.C. § 78u-5. Because plaintiffs fail to allege facts that would support a strong inference that defendants' statements were made with the requisite scienter, the Court will not reach these arguments.

on all facts alleged. <u>Tellabs</u>, 551 U.S. at 322-323; <u>In re Cabletron Sys, Inc.</u>, 311 F.3d 11, 38 (1st Cir. 2002) (instructing courts evaluating securities fraud claims to use a "fact specific approach that proceeds case-by-case," and not a "rigid formula").

Compelling evidence of scienter often includes direct evidence that a company's officers knew or were warned that they were withholding material information from investors. <u>In re Boston Sci. Corp. Sec. Litig.</u>, 686 F.3d at 31 (explaining that scienter can be successfully pleaded with "clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so.").

A strong inference of scienter can also be supported by indirect evidence. <u>In re Cabletron Sys, Inc.</u>, 311 F.3d at 38; <u>see also</u> <u>Tellabs</u>, 551 U.S. at 324 (stating that the inference of scienter "need not be irrefutable" or "of the 'smoking gun' genre"). "Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." <u>Day v. Staples, Inc.</u>, 555 F.3d 42, 45 (1st Cir. 2009) (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000) (internal quotations omitted)). Large distortions in accounting figures caused by the alleged fraudulent actions

14

support an inference of scienter. In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 199 (1st Cir. 2005) ("The larger the distortion of the company's accounting figures, the more likely it might be that such distortion could not be accomplished without either complicity, or reckless irresponsibility, of top officers."); see also Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001) (finding "accounting shenanigans" probative of scienter). Insider trading, or sudden sales of shares by the defendants, is also highly probative of scienter. Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999). The absence of any such allegations can weigh against a finding of scienter. See Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 272-73 (D. Mass 2013) ("[P]roper allegations of motive and opportunity generally arise from suspicious stock trading, but Plaintiff does not allege that Defendants sold any stock during the class period, let alone that any trades may have been suspicious").

On the other side of the coin, attempts by defendants to warn investors about risks weigh *against* an inference of scienter. Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 8 (1st Cir. 2006). Use of an outside auditor also can "weigh heavily against an inference of intent to defraud." Casula v. athenahealth, Inc., 2011 WL 4566115, at *7 (D. Mass. Sept. 30, 2011); see also Serabian v. Amoskaeg Bank Shares, Inc., 24 F.3d 357, 362 (1st Cir. 1994) (an outside auditor's approval of

allegedly fraudulent accounting "arguably cast[s] doubt on the existence of any impropriety"). The fact that a defendant held a particular position or title within the company is not sufficient, on its own, to support an allegation of scienter. Urman v. Novelos Therapeutics, Inc., 796 F. Supp. 2d 277, 284 (D. Mass. 2011) ("A general inference that [a defendant], by virtue of his position within the company . . . must have known about the [alleged fraud] is insufficient.").

With these principles in mind, the Court concludes that the plaintiffs fail to present a cogent and compelling inference of scienter as to any defendant. Plaintiffs allege that FMD's alleged "sale" was in reality a "sham transaction designed to generate undeserved income tax benefits for the Company." In support of this assertion, plaintiffs argue that FMD violated Generally Accepted Accounting Principles (GAAP) by characterizing the VCG Transaction as a sale. Plaintiffs also point to FMD's precarious financial circumstances following the 2008 financial crisis and the sizable effects the VCG Transaction and tax refunds had on the company's stock value and liquidity. But these facts–whether considered in isolation or collectively–do not suggest that FMD intended to defraud investors as opposed to making a good faith argument when it characterized the VCG Transaction as a sale.

Meanwhile, several facts create a much stronger inference that FMD had no intent to defraud investors when it announced the VCG Transaction. First, the company repeatedly warned investors that the tax consequences of the VCG Transaction were "complex and uncertain" and that the IRS audit could materially impact the company's financial position. See Ezra Charitable Trust, 466 F.3d at 8("[A]ttempts to provide investors with warnings of risks generally weaken the inference of scienter."). Second, the company fully disclosed the terms of the VCG Transaction to investors, including the complete text of the Purchase Agreement and Asset Services Agreement. Finally, FMD's outside auditor, KPMG, gave multiple opinions that the company's balance sheets were prepared "in conformity with U.S. generally accepted accounting principles" and "fairly present[ed], in all material respects, the financial position of the Company." While FMD may have been aggressive in taking certain tax positions with the IRS in an arcane area of the law, the complaint as a whole does not create a strong inference that defendants knew or believed the VCG Transaction was a sham or improperly treated as a sale.

Similarly, the allegations in the complaint do not support an inference that FMD intentionally misled its investors to think that the IRS audit in 2010 was routine and unlikely to lead to any proposed adjustments relating to the VCG Transaction. To the contrary, when announcing the IRS audit, FMD told investors up

17

front that the IRS might "challenge our tax positions" in connection with the "sale of the Trust Certificate." If such a challenge were successful, FMD also warned that "we may not keep all or a portion of the refund." Again, while the Court recognizes that FMD's tax position may have been aggressive, there are insufficient facts in the complaint to suggest that FMD knew that the IRS would reject its position when it made these statements.

The Court also finds that the complaint fails to establish scienter on the part of CFO Klipper and CEO Meyer. Plaintiffs attempt to prove CFO Klipper's scienter through his title in the company and background in accounting, but such generalized allegations are insufficient under the PSLRA. See Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998) ("[T]he pleading of scienter may not rest on a bare inference that a defendant *must have had* knowledge of the facts") (emphasis added); Coyne, 943 F. Supp. 2d at 272 ("Such a generalized motive could apply to any corporate executive at any company anywhere in the United States. It therefore cannot give rise to a strong inference of scienter.").

Inferences of CEO Meyers's scienter rest on more solid ground because he received a sizable bonus and pay bump partly attributed to his success in executing the VCG Transaction. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) ("When financial incentives to [engage in fraud] go far beyond the usual

arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter."); In re Sonus Networks, Inc. Sec. Litig., 2006 WL 1308165, at *15 (D. Mass. May 10, 2006) (noting that inferences of scienter are stronger where plaintiff alleges that fraudulent conduct resulted in "concrete benefits" to officer-defendant). But Meyers received the bonus seventeen months *after* the transaction, and the company cited multiple reasons for the changes in Meyers's compensation. Meyers had been voluntarily working for one dollar a year in compensation the previous two years, and his new salary of $800,000 was still less than the $1,000,000 base salary earned by his predecessor. Plaintiffs do not allege that Meyers was informed he was to receive a bonus when he executed the transaction, or that a bonus hinged on acquiring tax refunds from the transaction.

Plaintiffs also allege that Meyers "previously engaged in questionable behavior in connection with his personal financial dealings" concerning a deal involving FMD stock. But Meyers's personal liability in a wholly unrelated civil suit says little about his state of mind when making statements regarding the VCG Transaction. These allegations are not enough to surpass the heightened pleading requirements of the PSLRA.

**B. Section 20(a) Claim**

Section 20(a) of the Securities Exchange Act imposes control person liability on officers and directors of corporations that

commit security fraud. 15 U.S.C. § 78t(a). "The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation." <u>ACA Fin. Guaranty Corp.</u>, 512 F.3d at 67. Because plaintiffs fail to plead a primary section 10(b) violation, Count II is dismissed as to both individual defendants.

## IV. ORDER

Defendants' Motion to Dismiss (Docket No. 31) is **ALLOWED**.

                                       /s/ PATTI B. SARIS  
                                       Patti B. Saris  
                                       Chief United States District Judge